FILED
**United States Court of Appeals**
**Tenth Circuit**

**November 12, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JEFFREY GOOD,

    Plaintiff - Appellant,

v.

THE UNITED STATES DEPARTMENT
OF EDUCATION; THE HIGHER
EDUCATION LOAN AUTHORITY OF
THE STATE OF MISSOURI,

    Defendants - Appellees.

No. 22-3286

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:21-CV-02539-JAR-ADM)**
_____

Nandan M. Joshi, Public Citizen Litigation Group, Washington, DC (Allison M. Zieve, Public Citizen Litigation Group, Washington, DC, and Mark D. Molner, Evans & Mullinix, P.A., Shawnee, Kansas, with him on the briefs), for Plaintiff-Appellant.

Matthew D. Guletz, Thompson Coburn LLP, St. Louis, Missouri, for Defendant-Appellee, Higher Education Loan Authority of the State of Missouri.

Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington DC; Kate E. Brubacher, United States Attorney, Wichita, Kansas; and Mark B. Stern, Sarah Carroll, and David L. Peters, Attorneys, Appellate Staff Civil Division with the U.S. Department of Justice, Washington, DC, on the brief for Defendant-Appellee, United States Department of Education.

_____

Before **HOLMES**, Chief Judge, **MATHESON**, and **EID**, Circuit Judges.
_____

**HOLMES**, Chief Judge.

_____

After finding errors on his credit report, Plaintiff-Appellant Jeffrey Good sued, *inter alia*, the United States Department of Education ("the Department") and the Higher Education Loan Authority of the State of Missouri ("MOHELA") under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x.  The United States District Court for the District of Kansas ruled in favor of the Department and MOHELA and dismissed Mr. Good's claims against them.  Specifically, the district court granted the Department's motion to dismiss because FCRA did not waive the United States' sovereign immunity from suit, so the Department (as a United States agency) was entitled to sovereign immunity.  And the district court granted MOHELA's motion for judgment on the pleadings because it concluded that MOHELA was an arm of the State of Missouri and entitled to share in Missouri's Eleventh Amendment immunity from suit.

Mr. Good appeals from the district court's dismissal of his claims against both the Department and MOHELA.  With respect to the Department, we need not linger long: the parties agree that the district court's dismissal of the claims against the Department must be reversed in light of the Supreme Court's recent decision in *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42, 64 (2024).

The question of whether MOHELA is an arm of the State of Missouri entitled to immunity from suit, however, requires a deeper discussion.  It is an issue that has

divided the courts that have addressed it. After carefully considering the parties'

arguments, we conclude that MOHELA is *not* an arm of the state entitled to Eleventh

Amendment immunity.

Accordingly, exercising appellate jurisdiction under 28 U.S.C. § 1291, we

**reverse** the district court's judgment and **remand** this matter for additional

proceedings consistent with this opinion.

## I.     FACTUAL BACKGROUND

The following facts are drawn from the well-pleaded allegations in Mr. Good's

complaint. *See Aspenwood Inv. Co. v. Martinez*, 355 F.3d 1256, 1259 (10th Cir.

2004).

Jeffrey Good discovered that credit reports prepared by three major credit

reporting agencies—TransUnion, Experian, and Equifax—had errors in them. Mr.

Good contends that because of the errors on his credit reports, he suffered

embarrassment, the denial of a job opportunity, and a decreased credit score.

Mr. Good sent a document disputing the accuracy of his credit report to each

of the three credit reporting agencies and requested reinvestigation within thirty days.

Experian and Equifax made the requested correction; TransUnion did not.

TransUnion refused to correct the credit report even though it reported "two

delinquent tradelines simultaneously for the same account, for four different

accounts, which dramatically, improperly suppresse[d] Plaintiff's credit score."

Aplt.'s App. ¶ 32, at 12 (Compl., filed Nov. 19, 2021).

Mr. Good also disputed the accuracy of his credit reports with MOHELA—a servicer and representative of the Department that, at one point, held debts for which Mr. Good was responsible. MOHELA is engaged in assembling, evaluating, and disbursing information for the purpose of furnishing consumer reports. MOHELA refused to take the corrective measures required by FCRA with regard to the TransUnion credit report. The Department, which is also a furnisher of credit information, did the same.

## II.    PROCEDURAL HISTORY

Mr. Good filed his Complaint against MOHELA and the Department in the District Court of Johnson County, Kansas.[1] He asserted that MOHELA and the Department had violated FCRA and requested statutory, actual, and punitive damages. The Department removed this case to federal district court.

MOHELA answered the Complaint and filed a motion for judgment on the pleadings on the basis that it was entitled to Eleventh Amendment sovereign immunity. Mr. Good opposed this motion, arguing that MOHELA was not an arm of the State of Missouri and, consequently, was not entitled to Eleventh Amendment immunity. Separately, the Department moved to dismiss the claims against it because, as an agency of the United States, it had "sovereign immunity from suits

---

[1]    The Complaint, which was denominated "Petition for Damages," also named TransUnion as a party, but TransUnion and Mr. Good eventually reached a settlement.

under §§ 1681n and 1681o of the FCRA." Aplt.'s App. at 87 (Mem. in Support of Department's Mot. to Dismiss, filed Dec. 14, 2021).

On June 16, 2022, the district court granted the motions filed by the Department and MOHELA, and it dismissed Mr. Good's claims. With respect to the Department, the district court concluded that sovereign immunity barred the FCRA claims against it. The district court observed that our sister circuits were split on the question of whether FCRA waives the United States' sovereign immunity from suit. Ultimately, it reached the same conclusion as the Fourth and Ninth Circuits and concluded that the Department was entitled to sovereign immunity because "FCRA does not clearly and explicitly waive the United States' sovereign immunity." *Id.* at 208 (Dist. Ct. Order, filed June 16, 2022).

As to MOHELA, the district court concluded that it was an arm of the State of Missouri and thus entitled to Eleventh Amendment immunity. After acknowledging that the burden of showing an entitlement to Eleventh Amendment immunity rests with the party asserting that immunity, the district court considered four factors in determining whether MOHELA was entitled to Eleventh Amendment immunity: "(1) the character of the defendant under state law; (2) the autonomy of the defendant under state law; (3) the defendant's finances; and (4) whether the defendant is concerned primarily with state or local affairs." *Id.* at 190. The district court drew these factors from the Supreme Court's opinion in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280 (1977), and our opinion in

*Steadfast Insurance Co. v. Agricultural Insurance Co.* ("*Steadfast*"), 507 F.3d 1250, 1253 (10th Cir. 2007).

The district court addressed each factor in turn, beginning with the character of the defendant under state law. The district court reasoned that this factor weighed in favor of arm-of-the-state status because MOHELA was created by Missouri statute, its property and income were exempt from Missouri state taxation, and its board members were all designated by the State. The district court found it to be particularly relevant that a Missouri statute expressly denominated MOHELA as a "public instrumentality and body corporate" and that MOHELA was "declared to be performing a public function and to be a separate public instrumentality *of* the state." Aplt.'s App. at 191 (first quoting MO. REV. STAT. § 173.360; and then quoting MO. REV. STAT. § 173.415).

With respect to the second factor, the district court reasoned that it weighed "slightly" in favor of arm-of-the-state status because MOHELA was not autonomous. *See id.* at 192. In reaching this conclusion, the district court observed that the Governor of Missouri could appoint and remove MOHELA's board, that MOHELA was subject to certain restrictions in how it could conduct its business, and that MOHELA was required to have public meetings and to provide a yearly report to the Director of the Missouri Department of Higher Education & Workforce Development ("MDHEWD")[2] on its income, expenditures, and indebtedness. But the district court

---

[2]    Prior to January 2019, the Missouri Department of Higher Education and Workforce Development was known as the Missouri Department of Higher

admitted that there were also indicia that MOHELA had "some autonomy": in particular, MOHELA could hire its own employees, adopt bylaws, sue and be sued, acquire personal property, and was "financially independent from the state in certain situations." *Id.* The district court ultimately concluded, however, that "[o]n balance, the control that the state exercises over MOHELA through the appointment of the board, limitations on financial expenditures, and requirements for spending and filing reports weighs slightly in favor of finding that MOHELA is an arm of the state." *Id.*

As to the entity's finances, the third factor, the district court concluded that it weighed against arm-of-the-state status. It concluded that some considerations were neutral or weighed slightly in favor of immunity. But overall, the court found that this factor weighed against arm-of-the-state status because, as MOHELA conceded, any judgment against MOHELA would not directly affect the state treasury.

Finally, the district court determined that the fourth factor, whether the entity was concerned with local or state affairs, weighed in favor of arm-of-the-state status because MOHELA's focus was on statewide affairs like ensuring access to student loans for citizens of Missouri.

Balancing these four factors, the district court concluded that "the factors weigh in favor of finding MOHELA an arm of the State of Missouri," so MOHELA

---

Education. On January 17, 2019, Missouri Governor Michael Parson moved the Division of Workforce Development into the Missouri Department of Higher Education, and the department was subsequently renamed the Missouri Department of Higher Education and Workforce Development. *See* Missouri Exec. Order No. 19-03 (Jan. 17, 2019).

was "entitled to Eleventh Amendment immunity." *Id.* at 195. It accordingly granted judgment on the pleadings for MOHELA. The district court did observe, though, that courts have been divided over whether MOHELA qualified as an arm of the state.

The district court entered judgment on November 1, 2022. Mr. Good timely filed a notice of appeal.

## III.    STANDARD OF REVIEW

"We review a district court's ruling on a Federal Rule of Civil Procedure 12(c) motion for judgment on the pleadings de novo, applying the same standard of review used for a Rule 12(b)(6) motion to dismiss." *Dyno Nobel v. Steadfast Ins. Co.*, 85 F.4th 1018, 1025 (10th Cir. 2023). "To apply this standard, we accept as true all well-pleaded factual allegations in the complaint, 'resolve all reasonable inferences in the plaintiff's favor, and ask whether it is plausible that the plaintiff is entitled to relief.'" *Id.* (quoting *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013)). "'A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."'" *Id.* (quoting *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017)). "In other words, dismissal . . . is appropriate if the complaint alone is legally insufficient to state a claim." *Id.* (quoting *Brokers' Choice*, 861 F.3d at 1104–05).

Moreover, we "review de novo the district court's dismissal based on sovereign immunity." *Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 527 (10th Cir. 2022) (quoting *Mojsilovic v. Okla. ex rel. Bd. of Regents for Univ. of*

8

*Okla.*, 841 F.3d 1129, 1131 (10th Cir. 2016)); *see also Cornforth v. Univ. of Okla. Bd. of Regents*, 263 F.3d 1129, 1131 (10th Cir. 2001) ("Questions involving Eleventh Amendment immunity are questions of law that this court reviews *de novo*.").

## IV.   DISCUSSION: THE FCRA CLAIMS AGAINST THE DEPARTMENT

We begin by addressing Mr. Good's appeal of the district court's dismissal of the claims against the Department, which we can easily resolve.  During the pendency of this appeal,[3] the Supreme Court decided *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024).  In *Kirtz*, the Supreme Court concluded that FCRA effects a clear waiver of the United States' sovereign immunity, so "[a] consumer may sue 'any' federal agency for defying the law's terms." *Id.* at 64.  After the issuance of *Kirtz*, the parties filed a joint status report agreeing that "*Kirtz* compels reversal of the district court's ruling that Mr. Good's FCRA claim against [the Department] is barred by sovereign immunity and that oral argument on this issue is not necessary."  Jt. Status Report, No. 22-3286, at *1–2 (10th Cir., filed Feb. 15, 2024) (citation omitted).  We agree and, accordingly, reverse the district court's order dismissing the claims against the Department.[4]

---

[3]     We originally set this matter for oral argument for September 2023 Term of Court, but we *sua sponte* abated this case pending the issuance of a decision in *Kirtz*.

[4]     Before the district court, the Department also argued that even if FCRA waived the United States' sovereign immunity, the claims against it should still be dismissed for failure to state a claim.  But the Department does not assert this as an alternative ground for affirmance on appeal; in fact, it concedes that reversal is

## V.    DISCUSSION: THE FCRA CLAIMS AGAINST MOHELA

The remaining portion of this case—Mr. Good's appeal of the dismissal of the claims against MOHELA—boils down to one question: whether MOHELA is an arm of the State of Missouri ("the State") and thus entitled to share in Missouri's Eleventh Amendment immunity.  If it is, then Mr. Good cannot bring claims against it and we must affirm the district court's judgment.  If, on the other hand, MOHELA is not an arm of the state, it is not entitled to immunity, and we must reverse the district court's judgment.[5]

The courts that have considered whether MOHELA is an arm of the State of Missouri are divided on the issue.  *Compare Pellegrino v. Equifax Info. Servs., LLC*, 709 F. Supp. 3d 206, 210 (E.D. Va. 2024) (concluding that MOHELA was not an arm of the state entitled to Eleventh Amendment immunity), *and Dykes v. Mo. Higher*

---

proper in light of *Kirtz*.  We will thus not inquire into whether the claims against the Department could have been dismissed on alternative grounds.

[5]    To be sure, a conclusion that an entity is an arm of the state does not automatically mean that claims cannot be asserted against it.  To the contrary, state sovereign immunity can also be waived by a state or abrogated by Congress.  *See Mojsilovic*, 841 F.3d at 1131–32; *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1233 (10th Cir. 1999).  But, although Mr. Good argued before the district court that any sovereign immunity possessed by MOHELA had been waived by Missouri statute, he does not raise that argument on appeal.  Rather, he appears to accept MOHELA's premise that if it is entitled to Eleventh Amendment immunity as an arm of the state, his claims were properly dismissed.  Accordingly, Mr. Good has waived any argument that if MOHELA is an arm of the state, his claims could still nevertheless proceed.  *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019).  For purposes of this appeal, then, it is dispositive whether MOHELA is, in fact, an arm of the state.

10

*Educ. Loan Auth.*, No. 4:21-CV-00083-RWS, 2021 WL 3206691, at \*2–4 (E.D. Mo. July 29, 2021) (unpublished) (same)*, and Perkins v. Equifax Info. Servs., LLC*, No. SA-19-CA-1281-FB (HJB), 2020 WL 13120600, at \*2–5 (W.D. Tex. May 1, 2020) (recommended decision) (same), *with Gowens v. Capella Univ., Inc.*, No. 4:19-CV-362-CLM, 2020 WL 10180669, at \*2–4 (N.D. Ala. June 1, 2020) (unpublished) (concluding that MOHELA was entitled to sovereign immunity under the Eleventh Amendment because it was an arm of the state of Missouri), *and Stout v. Dep't of Educ.* (*In re Stout*), 231 B.R. 313, 315–17 (Bankr. W.D. Mo. 1999) (same).  We are the first circuit court to definitively opine on the issue.[6]

After considering the parties' well-crafted arguments, we conclude that MOHELA has not met its burden to show that it is an arm of the State of Missouri.  Thus, it is not entitled to Eleventh Amendment immunity, and we must **reverse** the dismissal of the claims against it.

We begin by discussing principles of Eleventh Amendment immunity and our arm-of-the-state jurisprudence.  Then we will lay out the parties' overarching arguments.  Finally, we apply our arm-of-the-state test to MOHELA and conclude that MOHELA has failed to show that it is an arm of the state entitled to share in Missouri's Eleventh Amendment immunity.

---

[6]    In *Nebraska v. Biden*, discussed *infra*, the Eighth Circuit noted that there was a split of authority on MOHELA's status and suggested that "MOHELA may well be an arm of the State of Missouri under the reasoning of our precedent." 52 F.4th 1044, 1047 (8th Cir. 2022).  But it did not resolve the issue.  *See id.*

11

## A.    Legal Standards

We first set out the relevant legal standards governing this matter.  In particular, we discuss (1) general principles of Eleventh Amendment immunity; (2) the history of our Eleventh Amendment arm-of-the-state-jurisprudence; and (3) how we have clarified our caselaw and distilled from it a helpful two-part test in *Hennessey v. University of Kansas Hospital Authority*, 53 F.4th 516 (10th Cir. 2022).

### 1.    The Eleventh Amendment

"The Eleventh Amendment states that '[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.'"  *Hennessey*, 53 F.4th at 527 (alteration in original) (quoting U.S. Const. amend. XI).  Notwithstanding its plain language— which purports to apply to only a limited subset of U.S. citizens, that is, "Citizens of another State"—the amendment has long been understood to have a broader reach: "The Eleventh Amendment generally bars suits against a state in federal court commenced by citizens of that state *or* citizens of another state."  *Elephant Butte Irr. Dist. of New Mexico v. Dep't of Interior*, 160 F.3d 602, 607 (10th Cir. 1998) (emphasis added) (citing *Hans v. Louisiana*, 134 U.S. 1, 13–15 (1890)); *accord J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1285 (10th Cir. 1999); *see also Ellis v. Univ. of Kansas Med. Ctr.*, 163 F.3d 1186, 1195 (10th Cir. 1998) ("Though the text of the Amendment does not expressly so provide, the Supreme Court has interpreted the

12

Amendment to apply to federal question suits against a State brought in federal court by the State's own citizens.").

The amendment's language embodies "the privilege of the sovereign not to be sued without its consent." *Hennessey*, 53 F.4th at 527 (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011)).[7] In practice, the Eleventh Amendment operates as "a jurisdictional bar that precludes unconsented suits in federal court against a state." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting *Wagoner Cnty. Rural Water Dist. No. 2 v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009)).

Eleventh Amendment immunity extends beyond states themselves to encompass "governmental entities that are 'arms of the state.'" *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir. 1996) (quoting *Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 994 (10th Cir. 1993) (en banc)); *see also Couser v. Gay*, 959 F.3d 1018, 1022 (10th Cir. 2020) ("Eleventh Amendment immunity applies not only to a state but also to an entity that is an arm of the state."); *accord Woods v.*

---

[7] A noteworthy point sometimes gets lost in the shuffle. Specifically, the sovereign immunity of states is *not* derived from the Eleventh Amendment itself. *See Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 243 (2019) ("The 'sovereign immunity of the States[] . . . neither derives from, nor is limited by, the terms of the Eleventh Amendment.'" (quoting *Alden v. Maine*, 527 U.S. 706, 713 (1999))). To the contrary, the Supreme Court has explained that sovereign immunity pre-dates the Eleventh Amendment and that the Eleventh Amendment was enacted in response to the Supreme Court's opinion in *Chisholm v. Georgia*, 2 U.S. 419 (1793), which eroded that pre-existing immunity. *See Hyatt*, 587 U.S. at 242–43; *see also Alden*, 527 U.S. at 728–29.

*Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) ("The immunity recognized by the Eleventh Amendment extends beyond the states themselves to 'state agents and state instrumentalities' that are, effectively, arms of a state." (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997))).  Put differently, "[t]he arm-of-the-state doctrine bestows immunity on entities created by state governments that operate as alter egos or instrumentalities of the states." *Watson*, 75 F.3d at 574.

The Eleventh Amendment, though, does not extend immunity to *all* entities associated with a state.  "In terms of scope, Eleventh Amendment immunity extends to states and state entities but not to counties, municipalities, or other local government entities."  *Hennessey*, 53 F.4th at 527 (quoting *Steadfast*, 507 F.3d at 1253).  Consequently, "[i]f a state entity is more like a political subdivision—such as a county or city—than it is like an instrumentality of the state, that entity is not entitled to Eleventh Amendment immunity."  *Id.* at 527–28 (quoting *Steadfast*, 507 F.3d at 1253); *see also Mascheroni v. Bd. of Regents of Univ. of Cal.*, 28 F.3d 1554, 1559 (10th Cir. 1994) ("Under the arm-of-the-state doctrine, courts classify state governmental bodies according to a dichotomy, in which arms of the state enjoy Eleventh Amendment immunity, whereas political subdivisions such as counties and cities do not."), *abrogated on other grounds by Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101 (2002).  Nor does Eleventh Amendment immunity "extend to private

corporations." *Tenison v. Byrd*, 826 F. App'x 682, 687 (10th Cir. 2020);[8] *accord Del Campo v. Kennedy*, 517 F.3d 1070, 1074 (9th Cir. 2008) (declining to extend Eleventh Amendment coverage to corporate actors or private entities).

The key inquiry, then, is whether an entity seeking the protection of the Eleventh Amendment qualifies as an arm of the state. If it does, it is entitled to Eleventh Amendment immunity. If not, Eleventh Amendment immunity is inapplicable. *See Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002) ("To assert Eleventh Amendment immunity, a defendant must qualify as a state or an 'arm' of a state." (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1232 (10th Cir. 1999))); *Duke v. Grady Mun. Schs.*, 127 F.3d 972, 974 (10th Cir. 1997) ("Eleventh Amendment immunity, however, 'extends only to the states and governmental entities that are "arms of the state."'" (quoting *Watson*, 75 F.3d at 574)); *see generally* 13 Charles Alan Wright, Arthur R. Miller, & Richard D. Freer, FEDERAL PRACTICE AND PROCEDURE § 3524.2 (3d ed.), Westlaw (database updated June 2024) ("[S]uit will often be against some political subdivision or agency of the state, or against individuals employed by such a subdivision or agency. In these cases, a federal court must determine whether such a defendant—for example, a city, a county, a multi-state agency, a public school, even an individual

---

[8]    We cite to unpublished decisions only for their persuasive value, recognizing that they do not constitute binding precedent. *See United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022).

such as a governor and other officer—should be considered an 'arm of the state' and therefore entitled to the state's immunity.").

The arm-of-the-state inquiry is ultimately a matter of federal law. *See Hennessey*, 53 F.4th at 528. But "arm-of-the-state status must be determined in each case by reference to the particular state laws characterizing the entity." *Id.* (quoting *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000)); *see also Duke*, 127 F.3d at 975 (noting that "[w]hether a local entity is an arm of the state under the Eleventh Amendment 'is a question of federal law'" but that this "'question can be answered only after considering the provisions of state law that define the agency's character'" (quoting *Doe*, 519 U.S. at 429 n.5)).

We recently joined our sister circuits in holding that "the burden falls on the entity asserting it is an arm of the state." *Hennessey*, 53 F.4th at 524; *accord Hutto v. S.C. Retirement Sys.*, 773 F.3d 536, 543 (4th Cir. 2014) (collecting cases); *Woods*, 466 F.3d at 237; *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 61 (1st Cir. 2003).[9]

---

[9] The question of which party bears the burden of showing arm-of-the-state status was a "matter of first impression for our circuit" in *Hennessey*. 53 F.4th at 529. The district court's decision in this case came before *Hennessey*, but even though the district court did not have the guidance of that decision, it nevertheless properly concluded that "[t]he burden of proof is on Defendant" to show its entitlement to Eleventh Amendment immunity. Aplt.'s App. at 190 (citing *Teichgraeber v. Mem'l Union Corp. of the Emporia State Univ.*, 946 F. Supp. 900, 903 (D. Kan. 1996)).

### 2. Development of Our Arm-Of-The-State Jurisprudence

Over the years, we have developed a robust doctrine for determining whether an entity created by a state is, in fact, an arm of the state entitled to Eleventh Amendment immunity. Our analysis has consistently depended on the extent of the relationship between the entity and the state, how the entity is structured, and whether there would be a financial impact on the state's treasury from a judgment against an entity purporting to share in the state's sovereignty.

Although we have always relied on the same overarching considerations and concerns, our articulation of these considerations and concerns has varied, however. For example, at times, we have articulated four factors—called the *Steadfast* factors—as being relevant to the inquiry of whether an entity is an arm of the state entitled to Eleventh Amendment immunity: (1) "the character ascribed to the entity under state law"; (2) "the autonomy accorded the entity under state law"; (3) "the entity's finances"; and (4) "whether the entity in question is concerned primarily with local or state affairs." *Steadfast*, 507 F.3d at 1253; *see also Couser*, 959 F.3d at 1022 (using the *Steadfast* articulation of the relevant factors).

At other times, we have framed the contours of the arm-of-the-state analysis slightly differently. For instance, we sometimes used a *different* four-factor test in determining whether an entity was so closely bound up with a state such that it would be entitled to share in the state's Eleventh Amendment immunity. *See Sutton*, 173 F.3d at 1232 (considering "(1) the characterization of the governmental unit under state law; (2) the guidance and control exercised by the state over the

17

governmental unit; (3) the degree of state funding received; and (4) the governmental unit's ability to issue bonds and levy taxes on its own behalf" (citing *Ambus*, 995 F.2d at 994)); *Elam Constr., Inc. v. Reg'l Transp. Dist.*, 129 F.3d 1343, 1345 (10th Cir. 1997) (considering the same four factors); *Sonnenfeld v. City & Cnty. of Denver*, 100 F.3d 744, 749 (10th Cir. 1996) (same).

In other instances, we have applied a version of the arm-of-the-state test with three factors. *See U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 718 (10th Cir. 2006) (considering "(1) the state's legal liability for a judgment; (2) the degree of autonomy from the state—both as a matter of law and the amount of guidance and control exercised by the state; and (3) the extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing"), *abrogated on other grounds by Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 587 U.S. 262 (2019). And in still other cases, we have applied a five-factor test. *See Colby v. Herrick*, 849 F.3d 1273, 1276 (10th Cir. 2017) (considering (1) the characterization of the entity under state law, (2) how much state guidance and control is exercised over the entity, (3) how much funding the entity receives from the state, (4) whether the entity has the ability to issue bonds and levy taxes, and (5) whether the state bears legal liability for a judgment against the entity). Finally, we have at times relied on a more open-ended list of considerations, *see, e.g.*, *Duke*, 127 F.3d at 978, or framed the arm-of-the-state analysis as involving two "general inquiries"—"the degree of autonomy given to the agency" and "the extent of financing the agency receives independent of the state treasury and its ability to

18

provide for its own financing," *Watson*, 75 F.3d at 574–75 (quoting *Haldeman v. State of Wyo. Farm Loan Bd.*¸ 32 F.3d 469, 473 (10th Cir. 1994)).

In sum, our precise articulation of the factors relevant to the arm-of-the-state determination has, admittedly, not been uniform.  But our tests differ from each other only in terms of linguistic framing—*not* in terms of substance.  Endeavoring, as we must, to "interpret our cases in a manner that permits them to coexist harmoniously," *United States v. Mier-Garces*, 967 F.3d 1003, 1018 (10th Cir. 2020) (quoting *United States v. Hansen*, 929 F.3d 1238, 1254 (10th Cir. 2019)), it becomes clear that the variability in how we have framed the arm-of-the-state test—*viz.*, how many factors there are and the precise contours of each factor—is simply cosmetic.  In other words, our precedents differ only in terms of how we have divided up and articulated the *same* set of key considerations: specifically, the entity's (a) legal character, (b) administrative autonomy, (c) financial independence; and (d) structure and goals; and whether a judgment against the entity would have an impact on the state's treasury.  Regardless of how we have sliced up and phrased these considerations, there is no meaningful difference among our precedents in terms of *what matters* in determining whether an entity may share in a state's sovereignty.

### 3.    The *Hennessey* Two-Step Test

Our most recent foray into the arm-of-the-state doctrine came in *Hennessey v. University of Kansas Hospital Authority*, 53 F.4th 416 (10th Cir. 2022).  Relying on principles that have deep roots in our arm-of-the-state jurisprudence, *Hennessey* clarified the law by creating a comprehensive and helpful test for determining if a

19

state-created entity is entitled to share in a state's Eleventh Amendment immunity. *Hennessey*'s clarification amounts to a careful and reliable distillation of the substance of our precedents. It is the *Hennessey* test that we apply in conducting the arm-of-the-state inquiry as to MOHELA.

Hennessey explained that "[i]n assessing whether an entity is an arm of the state, we employ a two-step process." 53 F.4th at 528. "As an initial, sometimes dispositive step," we evaluate the four "primary" *Steadfast* factors articulated above. *Id.* Specifically:

> *First*, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. *Second*, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity. *Third*, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf. *Fourth*, we ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose.

*Id.* (quoting *Steadfast*, 507 F.3d at 1253). We described this stage of the inquiry as involving "four structural factors." *Id.* at 543. As is clear from our pre-*Hennessey* precedents, there is some overlap between these factors—in other words, particular attributes of an entity might come into play under more than one factor. *See Steadfast*, 507 F.3d at 1254–55 (considering the fact that the entity's employees were designated as employees of the state in both the second and fourth *Steadfast* factors); *cf. Sturdevant*, 218 F.3d at 1164–65 (noting, in a predecessor to *Steadfast*, that "our

20

consideration of the various enumerated factors requires consideration of certain aspects of a state entity in multiple contexts").

If all of these factors point in the same direction, that is the end of the analysis. *See Hennessey*, 53 F.4th at 528, 543. But if the *Steadfast* factors "are in conflict and point in different directions, a court should proceed to the second step and consider the 'twin reasons' underlying the Eleventh Amendment—avoiding an af[f]ront to the dignity of the state and the impact of a judgment on the state treasury." *Id.* at 528; *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994) ("When indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain our prime guide.").[10]

"Of these twin reasons, the 'foremost' reason for sovereign immunity is avoiding state liability for any judgment against the entity." *Hennessey*, 53 F.4th at 528 (quoting *Sikkenga*, 472 F.3d at 718).[11] "The focus of this judgment liability

---

[10]    *Hess* involved a bi-state entity rather than an entity created by one state like MOHELA. *Hess*, 513 U.S. at 35 (noting that "[t]he Port Authority, whose Eleventh Amendment immunity is at issue in these cases, was created in 1921, when Congress, pursuant to the Constitution's Interstate Compact Clause, consented to a compact between the Authority's parent States"—that is, New York and New Jersey. (footnote omitted)). But courts, including us, have repeatedly relied upon *Hess* in developing principles for arm-of-the-state jurisprudence. *See, e.g.*, *Hennessey*, 53 F.4th at 528 n.3; *Fresenius*, 322 F.3d at 62, 66–68.

[11]    We have repeatedly characterized the necessity to protect the state treasury—i.e., the state's potential legal liability for a judgment against an entity—as the "foremost" of the Eleventh Amendment's twin goals. *See Hennessey*, 53 F.4th at 528; *Sikkenga*, 472 F.3d at 718; *see also Duke*, 127 F.3d at 980 (describing this as the "most important" factor in the arm-of-the-state analysis). This is consistent with *Hess*, in which the Supreme Court described "the vulnerability of the State's purse" as "the most salient factor in Eleventh Amendment determinations." 513 U.S. at 48;

*see also id.* ("[R]endering control dispositive does not home in on the impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of a State's treasury."). Yet, even then, whether a judgment would impact the state treasury is not dispositive. *See Colby*, 849 F.3d at 1278; *Duke*, 127 F.3d at 978.

Further, we acknowledge that the Supreme Court has possibly changed course as to which interest protected by state sovereign immunity is the most important. In particular, the Supreme Court has, in more recent cases, emphasized that "[t]he preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002); *see also id.* at 765 ("While state sovereign immunity serves the important function of shielding state treasuries and thus preserving 'the States' ability to govern in accordance with the will of their citizens,' the doctrine's central purpose is to 'accord the States the respect owed them as' joint sovereigns." (citation omitted) (first quoting *Alden*, 572 U.S. at 750–51; and then quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993))); *see generally* 13 Wright, Miller, & Freer, *supra*, § 3524.2 ("Instead of focusing solely—or even primarily—upon avoiding an imposition on the state treasury, the [Supreme] Court increasingly has emphasized the importance of freeing the states from the indignity of being subjected to litigation in the federal courts."). In light of this, some of our sister circuits have jettisoned arm-of-the-state tests that give any special weight to the question of impact on the state treasury. *See, e.g.*, *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1030 (9th Cir. 2023); *Benn v. First Jud. Dist. of Pa.*, 426 F.3d 233, 239–40 (3d Cir. 2005); *cf. P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 873–74 (D.C. Cir. 2008) (rejecting an argument that the impact on the treasury should be given particular weight); *see generally* Jameson B. Bilsborrow, Comment, *Keeping the Arms in Touch: Taking Political Accountability Seriously in the Eleventh Amendment Arm-of-the-State Doctrine*, 64 EMORY L.J. 819, 835 (2015) ("[S]ome lower courts have . . . taken a cue from *Federal Maritime* by reducing the weight of factors that measure the degree of state treasury implication relative to the other factors these courts consider in their arms analyses."). But some of our sister circuits have continued to describe the impact on the treasury as the most important factor in the arm-of-the-state analysis. *See DuPage Reg'l Off. of Educ. v. U.S. Dep't of Educ.*, 58 F.4th 326, 340–41 (7th Cir. 2023); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 433 (6th Cir. 2020); *U.S. ex rel. Fields v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist.*, 872 F.3d 872, 883 (8th Cir. 2017); *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 137 (2d Cir. 2015). Indeed, the Second Circuit has expressly declined to alter its framework in light of the Supreme Court's opinion in *Federal Maritime*, reasoning that "the two inquiries—(1) what entities are entitled to partake of the State's immunity, and (2) what protections are afforded the state under the Eleventh Amendment—are distinct." *Woods*, 466 F.3d at 242.

issue is on *direct* legal liability and not on any indirect or practical loss of funds to the state." *Hennessey*, 53 F.4th at 529 (emphasis added). "While focusing on legal liability rather than practical effect may 'ignore[] economic reality,' it 'provides a clear and workable test in this very confused area of the law. It directs courts away from having to make case-by-case fact-specific determinations of the practical impact on state treasuries.'" *Id.* (alteration in original) (quoting *Duke*, 127 F.3d at 981). Indeed, "[w]here it is clear that the state treasury is not at risk, then the control exercised by the state over the entity does not entitle the entity to Eleventh Amendment immunity." *Id.* (quoting *Fresenius*, 322 F.3d at 65).

With respect to the second of these twin goals—the dignity of the state—we

> must remember that where "the state has not clearly demarcated the entity as sharing its sovereignty, there is great reason for caution" because "[i]t would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty."

---

Here, neither party has argued that we are free to revisit and ultimately discard our precedent that accords—as between the twin goals—the most weight to the impact-on-the-treasury element in light of "a superseding contrary decision by the Supreme Court." *Barnes v. United States*, 776 F.3d 1134, 1147 (10th Cir. 2015) (quoting *In re Smith*, 10 F.3d 723, 724 (10th Cir.1993) (per curiam) (emphasis omitted)). And we do not believe that the "message" of *Federal Maritime* or any other recent Supreme Court precedent regarding the place of dignity interests—as between the twin goals—is "so indisputable and pellucid," *id.*, that, at least absent briefing from the parties, it is prudent for us to take up and resolve that matter on our own. Therefore, we leave the resolution of this issue for another day.

*Hennessey*, 53 F.4th at 529 (alteration in original) (quoting *Fresenius*, 322 F.3d at 63). "To this point, '[n]ot all entities created by states are meant to share state sovereignty.'" *Id.* (alteration in original) (quoting *Fresenius*, 322 F.3d at 64). "Some entities may be part of an effort at privatization, representing an assessment by the state that the private sector may perform a function better than the state." *Id.* (quoting *Fresenius*, 322 F.3d at 64).

The two-step *Hennessey* analysis was a clarification of, rather than a substantive modification to, our earlier precedents.[12] Starting with *Hennessey*'s first step, the *Steadfast* factors embody considerations and sub-factors—for instance, an entity's ability to issue bonds and levy taxes, its financial independence, and its state-law characterization—that stem from our earlier arm-of-the state decisions. *See, e.g.*, *Colby*, 849 F.3d at 1276 (considering, *inter alia*, the entity's financial independence and its ability to issue bonds and levy taxes); *Sturdevant*, 218 F.3d at 1166 (characterizing the "autonomy and financial independence" inquiry as looking to, *inter alia*, "'the characterization of the governmental unit under state law'" and "'the governmental unit's ability to issue bonds and levy taxes on its own behalf'" (quoting *Sutton*, 173 F.3d at 1232)); *Duke*, 127 F.3d at 978 (considering, *inter alia*, "the characterization and definition of the entity in its enabling and implementing

---

[12]    In one tangential (yet significant) respect, *Hennessey* did plow new ground: as referenced *supra*, it held for the first time in this circuit that the burden to show arm-of-the-state status is on the party asserting an entitlement to Eleventh Amendment immunity. *See Hennessey*, 53 F.4th at 524, 529–30.

legislation" and "the fiscal independence of the entity").  Thus, *Hennessey*'s first step—comprised of the *Steadfast* factors—does not deviate from the substance of the considerations and sub-factors that our prior arm-of-the-state precedent deemed relevant; rather, the first step simply defined, in an enumerated fashion, a clear way to assess them.

*Hennessey*'s second step, too, is a natural extension of our arm-of-the-state precedents.  In particular we have long emphasized that the twin goals underlying the Eleventh Amendment are our principal focus if indicators of immunity point in different directions.  *See Sikkenga*, 472 F.3d at 721 ("[W]hen indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain our prime guide." (quoting *Hess*, 513 U.S. at 47)); *Duke*, 127 F.3d at 978.  Likewise, the importance that we attach to the state's ultimate liability for a judgment against the entity is well-rooted in our precedents.  *See Sikkenga*, 472 F.3d at 718 (describing the impact on the treasury as the "foremost" consideration); *Sturdevant*, 218 F.3d at 1164 (describing the impact on the treasury as "particularly important"); *Elam Constr.*, 129 F.3d at 1345 ("Historically, the most important consideration is whether a judgment against the entity would be paid from the state treasury.  The state's potential legal liability is of central importance." (citation omitted)); *Duke*, 127 F.3d at 980 ("The final, but the most important, factor is whether the state treasury would be at risk of paying a judgment . . . ."); *Sonnenfeld*, 100 F.3d at 749 ("The most important factor in determining whether a governmental entity is entitled

25

to Eleventh Amendment immunity is whether a judgment against it would be paid from the state treasury.").

To sum up: in *Hennessey*, we clarified our earlier precedents and distilled from them a helpful two-step process for determining whether a state-created entity is an arm of the state. At the first step, we consider the four *Steadfast* factors. If those factors all point in the same direction, the inquiry ends. But if those factors point in different directions, we focus on the twin reasons underlying the Eleventh Amendment. We turn now to applying *Hennessey*'s two-step process to MOHELA.

## B.     The Parties' Arguments

At a high level, Mr. Good argues that MOHELA is not an arm of the state entitled to Eleventh Amendment immunity. He argues that the first, second, and third *Steadfast* factors weigh against arm-of-the-state status, while the fourth Steadfast factor "does not clearly weigh in either direction." Aplt.'s Opening Br. at 43. Accordingly, he contends that the *Steadfast* factors "provide a strong and sufficient basis for concluding that MOHELA has not satisfied its burden of demonstrating that it is an arm of the state." *Id.* Furthermore, Mr. Good contends that if we were to reach the second step of the analysis, we should conclude that "immunizing MOHELA from suit implicates neither of the twin principles underlying state sovereign immunity—state dignity and protection of the state treasury." *Id.* at 23–24.

In response, MOHELA argues that it is an arm of the state and thus entitled to Eleventh Amendment immunity. MOHELA contends that the four *Steadfast* factors

26

weigh conclusively in its favor—*viz.*, it argues that the first and fourth *Steadfast* factors "clearly support immunity," the second *Steadfast* factor is "complex" but supports immunity, and the third *Steadfast* factor "favors immunity or is neutral." Aplee.'s Resp. Br. at 11.[13]  As such, MOHELA argues that there is no need to reach the twin goals of the Eleventh Amendment.  And MOHELA argues that even if we were to reach that second step of the analysis, the twin goals of the Eleventh Amendment "do not sway the ultimate result that MOHELA is an arm of the state." *Id.* at 40 (bold typeface omitted).

## C.    Analysis

We turn now to the task of determining whether MOHELA is an arm of the state.  For the reasons that follow, we conclude that MOHELA has not carried its burden to show that it is, so MOHELA is not entitled to share in Missouri's Eleventh Amendment immunity.

We begin by discussing a threshold question: whether the Supreme Court's recent opinion in *Biden v. Nebraska*, 600 U.S. ----, 143 S. Ct. 2355 (2023), resolved the question of MOHELA's arm-of-the-state status.  Because we conclude that it did not, we will turn to our arm-of-the-state test.  At the first *Hennessey* step, the *Steadfast* factors point in different directions; accordingly, they are not dispositive, and we must proceed to the second step.  At the second step, we consider the twin

---

[13]    References to "Aplee.'s Resp. Br." in this opinion refer to the brief filed by MOHELA rather than the brief filed by the Department.

goals underlying the Eleventh Amendment and conclude that MOHELA is not an arm of the state entitled to Eleventh Amendment immunity.

### 1. Whether *Biden v. Nebraska* Resolved the Issue

Before beginning the arm-of-the-state analysis, we must address whether, as MOHELA seems to argue,[14] the Supreme Court's opinion in *Biden*, 143 S. Ct. 2355, resolved MOHELA's arm-of-the-state status. We conclude that although the Supreme Court's *Biden* opinion is certainly relevant and highlights many of MOHELA's best arguments, it does not resolve the question before us. Therefore, we must undertake our own arm-of-the-state inquiry.

*Biden* involved a challenge by several states, including Missouri, to the Secretary of Education's cancellation of student loans under the HEROES Act. *See id.* at 2362, 2365. One of the key issues was whether the states had standing to bring

---

[14] It is not pellucid whether MOHELA actually argues that the Supreme Court definitively resolved MOHELA's arm-of-the-state status in *Biden*. *Compare* Oral Arg. Recording at 15:45–16:08 ("So our position, candidly, is [the] Supreme Court has said MOHELA is indeed part of the State of Missouri, and stop. But if you proceed to the four factors under the *Hennessey* test, the four primary factors, I think you can look at what the Supreme Court has said and you can easily find that those factors weigh . . . ."), *and* Aplee.'s Resp. to Notice of Suppl. Auth., ECF No. 22-3286, at *1 (10th Cir., filed Apr. 4, 2024) (noting that the *Pellegrino* court "incorrectly" concluded that *Nebraska* did "not resolve the question of whether MOHELA is entitled to Eleventh Amendment immunity"), *with* Oral Argument Recording at 14:18–14:29 (conceding that the standing analysis in *Biden* is an "analytically distinct concept[]" from sovereign immunity and that *Biden* may not resolve the issue), *and* Aplee.'s Notice of Suppl. Auth., ECF No. 22-3286, at *1 (10th Cir., filed July 7, 2023) (asserting no more than *Biden* "*supports* MOHELA's arguments" (emphasis added)). For purposes of this opinion, we assume that MOHELA has made the argument that *Biden* resolves the arm-of-the-state inquiry before us.

that challenge. *See id.* at 2365. The Supreme Court concluded that Missouri had standing because "the Secretary's plan harms MOHELA and thereby directly injures Missouri—conferring standing on that State." *Id.*

The Supreme Court began its standing analysis by discussing MOHELA's role as a student loan servicer and then moving on to explain why a "harm to MOHELA is also a harm to Missouri." *Id.* at 2366. It observed that "MOHELA is a 'public instrumentality' of the State" and was "established . . . to perform the 'essential public function' of helping Missourians access student loans needed to pay for college." *Id.* (quoting MO. REV. STAT. § 173.360). Furthermore, it noted that MOHELA was "subject to the State's supervision and control." *Id.*

The Court continued:

> By law and function, MOHELA is an instrumentality of Missouri: It was created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State. The Secretary's plan will cut MOHELA's revenues, impairing its efforts to aid Missouri college students. This acknowledged harm to MOHELA in the performance of its public function is necessarily a direct injury to Missouri itself.

*Id.* The Court acknowledged that MOHELA was a public instrumentality with a "distinct personality," but concluded that "such an instrumentality—created and operated to fulfill a public function—nonetheless remains '(for many purposes at least) part of the Government itself.'" *Id.* at 2367 (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995)).

29

Contrary to MOHELA's suggestion, however, *Biden* did not resolve the question before us. To be sure, *Biden* certainly stands for the proposition that there is enough of a link between MOHELA and Missouri for an injury to the former to constitute an injury to the latter. But, as MOHELA admitted at oral argument, standing is an "analytically distinct concept[]" from the Eleventh Amendment question before us here. Oral Arg. Recording at 14:18–14:29. The question at issue in this appeal is whether MOHELA is *so interconnected* with Missouri that it could be considered an arm of the state for purposes of the Eleventh Amendment. That is not a question that the Supreme Court purported to resolve,[15] and we will not read more into the *Biden* decision than what is there. *Accord Pellegrino*, 709 F. Supp.3d at 212 ("Although the Supreme Court found a relationship between Missouri and MOHELA sufficient to give Missouri standing, because sovereign immunity requires an analysis into the extent of an entity's relationship with a state, the Supreme Court's analysis in *Biden* does not resolve the question of whether MOHELA is entitled to Eleventh Amendment immunity.").

---

[15]     This conclusion tracks with the history of the *Biden* litigation. In that litigation, the district court concluded that Missouri could not establish standing in part because MOHELA was not an arm of the state. *See Nebraska v. Biden*, 636 F. Supp. 3d 991, 999–1000 (E.D. Mo. 2022), *rev'd* 143 S. Ct. 2355. The Eighth Circuit observed that MOHELA "may well be an arm of the State of Missouri" under its precedent, but it declined to actually resolve the issue because "even if MOHELA is *not* an arm of the State of Missouri," the connection between MOHELA and Missouri was sufficient to give standing to Missouri. *Nebraska*, 52 F.4th at 1047 (emphasis added). The Supreme Court agreed with the Eighth Circuit that the district court's judgment would have to be reversed on this basis, and it did not decide whether MOHELA was an arm of the State. *See Biden*, 143 S. Ct. at 2366.

Moreover, the *Biden* majority—as well as the *Biden* dissent—noted that "a public corporation can count as part of the State for some but not 'other purposes.'" *Biden*, 143 S. Ct. at 2368 n.3; *see also id.* at 2390 & n.1 (Kagan, J., dissenting). And *Biden* itself relied on *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), in which the Supreme Court concluded that Amtrak was an agency or instrumentality of the United States for purposes of complying with the First Amendment but observed that, by statute, it did not share in the United States' sovereign immunity. *See* 513 U.S. at 392, 394. Thus, although *Biden* concluded that MOHELA was part of Missouri for purposes of standing, it does not necessarily follow that MOHELA is a part of Missouri for purposes of the Eleventh Amendment, and we do not read *Biden* as making that determination.

True, it cannot be gainsaid that *Biden* illuminates highly relevant aspects of MOHELA's relationship with the State of Missouri. For example, the Supreme Court pointed to various aspects of MOHELA's structure that are quite relevant to the first and second *Steadfast* factors. *See* 143 S. Ct. at 2366. And the *Biden* Court stated that MOHELA was an "instrumentality of Missouri," *see id.*, and the general rule is that state instrumentalities are arms of the state, *see Lewis v. Clarke*, 581 U.S. 155, 166 (2017) ("It is well established in our precedent that a suit against an arm or instrumentality of the State is treated as one against the State itself."); *Sturdevant*, 218 F.3d at 1171 ("[T]he Board enjoys Eleventh Amendment immunity as an instrumentality or 'arm' of the State of Colorado."). *But see Doe*, 519 U.S. at 429 ("When deciding *whether* a state instrumentality may invoke the State's immunity,

31

our cases have inquired into the relationship between the State and the entity in question." (emphasis added)).  But we are convinced that *Biden* did not definitively opine upon or resolve the arm-of-the-state question before us.  And, to the extent that MOHELA argues otherwise, we believe that MOHELA overreads *Biden*.

Accordingly, we must undertake a full arm-of-the-state analysis to resolve this appeal.  That analysis will of course be informed (as relevant) by *Biden* and its observations regarding MOHELA.

### 2.    The First Step of the Arm-of-the-State Test: The *Steadfast* Factors

Turning to the arm-of-the-state inquiry, we begin with the first step outlined in *Hennessey*: considering the four *Steadfast* factors.  Recall that the four *Steadfast* factors are (a) the characterization of the entity under state law; (b) the entity's autonomy; (c) the entity's finances and financial independence; and (d) whether the entity is concerned with state or local affairs.  *See Hennessey*, 53 F.4th at 528; *Steadfast*, 507 F.3d at 1253.

We conclude that the *Steadfast* factors point in different directions and thus do not resolve the inquiry.  Specifically, the first and fourth *Steadfast* factors weigh in favor of MOHELA and arm-of-the-state status.  The second and third factors weigh against MOHELA—and thus in favor of Mr. Good.

At the outset, it is important to acknowledge one constraint on our analysis: with only minimal exceptions, MOHELA did not support its motion with any evidence besides citations to its enabling act.  Often, in this arm-of-the-state litigation, parties submit evidence about the entity's finances or other circumstances

32

that bear on the Eleventh Amendment inquiry. *See, e.g.*, *Hennessey*, 53 F.4th at 530–31. MOHELA has not done so here. Nor has Mr. Good. We are thus largely limited to looking at Missouri law in our analysis of the *Steadfast* factors.

###### a.    The First Factor: Character of the Entity Under State Law

The first *Steadfast* factor, the characterization of the entity under state law, points in favor of MOHELA being considered an arm of the State of Missouri.

The focus of this factor is on how state statutes and other sources of state law characterize the entity. *See Couser*, 959 F.3d at 1026–27 (considering how sheriffs are characterized under Kansas law); *see also Colby*, 849 F.3d at 1276–77 (assessing how horse-inspection entity was "characterized under Colorado law"). This involves a "formalistic survey of state law to ascertain whether the entity is identified as an agency of the state." *Hennessey*, 53 F.4th at 528 (quoting *Steadfast*, 507 F.3d at 1253). In addressing this factor, we consider relevant state statutes, regulations, court decisions, and constitutional provisions. *See Duke*, 127 F.3d at 979–80; *Ambus*, 995 F.2d at 995; *accord U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency* ("*Oberg II*"), 745 F.3d 131, 148 (4th Cir. 2014) ("In addressing this factor, a court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question." (quoting *Md. Stadium Auth. v. Ellerbe Becket, Inc.*, 407 F.3d 255, 264 (4th Cir. 2005))).

We agree with MOHELA that this factor weighs in favor of it being considered an arm of the State of Missouri. Our analysis begins (and largely ends)

33

with the primary source relied on by the parties—the Missouri Higher Education Loan Authority Act ("the Act"), MOHELA's enabling statute. *See* MO. REV. STAT. §§ 173.350–173.445. Taken as a whole, the language of the Act indicates that, as a matter of Missouri law, MOHELA qualifies as a state agency.

The Act repeatedly emphasizes that MOHELA is a public instrumentality of the State of Missouri and performs a public function. In particular, the Act provides that MOHELA "is hereby constituted a *public instrumentality* and body corporate, and the exercise by the authority of the powers conferred by [statute] shall be deemed to be the performance of an *essential public function*." MO. REV. STAT. § 173.360 (emphases added). Elsewhere, the Act provides that MOHELA "is hereby declared to be performing a public function and to be a separate public instrumentality *of the state*." *Id.* § 173.415 (emphasis added); *see also id.* ("[A]ll bonds or other forms of indebtedness issued by the authority shall be deemed to be securities issued by a *separate public instrumentality of the state of Missouri*." (emphasis added)).

The use of "public instrumentality of the state" is one indicator that MOHELA is considered to be a state agency. *See Lewis*, 581 U.S. at 166 ("It is well established in our precedent that a suit against an arm or instrumentality of the State is treated as one against the State itself."); *Sturdevant*, 218 F.3d at 1171 ("[T]he Board enjoys Eleventh Amendment immunity as an instrumentality or 'arm' of the State of Colorado."); *Watson*, 75 F.3d at 574 (noting that the arm-of-the-state doctrine bestows immunity on entities that "operate as alter egos or instrumentalities of the states"); *see also Sikkenga*, 472 F.3d at 721 n.28 (noting the "distinction" between

34

"instrumentalities of the state," which are entitled to Eleventh Amendment immunity, and "political subdivisions," which are not). And the related statutory references to MOHELA's important public function point in the same direction. *See Irizarry-Mora v. Univ. of P.R.*, 647 F.3d 9, 14 (1st Cir. 2011) (considering it probative that a university's enabling statute made clear that the university was performing an important public role).

The Act contains other indicia that, as a formalistic matter of state law, indicate that MOHELA is intended to be a state agency. In particular, the Act expressly "assign[s]" MOHELA to MDHEWD. *See* Mo. Rev. Stat. § 173.445. MDHEWD is headed by the Missouri Coordinating Board for Higher Education, *see id.* § 173.005.2, which is designated as an "official state agency," *see id.* § 173.050(1). Mr. Good does not seem to dispute that MDHEWD itself is a state executive agency. The fact that MOHELA is "assigned" to an executive department by statute is an indicator that, as a matter of state law, it is a state agency. *Cf. Couser*, 959 F.3d at 1027 (considering it relevant that the Kansas Constitution did "not expressly designate sheriffs as members of the state executive department").

Moreover, Missouri law makes clear that MOHELA's "proceedings and actions . . . shall comply with all statutory requirements respecting the conduct of public business by a public agency." Mo. Rev. Stat. § 173.365. This supports the conclusion that MOHELA is an arm of the state. *See Steadfast*, 507 F.3d at 1254–55 (considering it relevant that state law required that an entity's accounts and contracts be open to public inspection); *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1034

35

(9th Cir. 2023) (deeming it relevant that an entity was "subject to California public-records and open-meeting laws"); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency* ("*Oberg III*"), 804 F.3d 646, 675–76 (4th Cir. 2015) (agreeing with the district court's conclusion that the characterization of a student loan servicer under state law indicated that it was an arm of the state because, *inter alia*, the entity was "subject to Pennsylvania open-meeting and right-to-know laws"); *cf. Takle v. Univ. of Wis. Hos. & Clinics Auth.*, 402 F.3d 768, 771 (7th Cir. 2005) (describing the fact that an entity was subject to open-meeting laws as a "really minor string[]" of state control).  Finally, the Act provides that MOHELA's income and property "shall be exempt from all taxation in the state of Missouri" because MOHELA "is hereby declared to be performing a public function and to be a separate public instrumentality of the state." MO. REV. STAT. § 173.415.  This, too, is an indication that MOHELA is considered to be a part of the State of Missouri under state law. *See Kohn¸* 87 F.4th at 1034; *Karns v. Shanahan*, 879 F.3d 504, 517 (3d Cir. 2018); *Oberg II*, 745 F.3d at 142; *Irizarry-Mora*, 647 F.3d at 14.

We thus agree with MOHELA that relevant provisions of Missouri law indicate that MOHELA was structured as a state agency.[16]  This conclusion is in line with the Supreme Court's *Biden* opinion, which highlighted many of the same aspects of MOHELA's structure.  In particular, the *Biden* Court observed:

---

[16]   MOHELA additionally argues that, by statute, its board is appointed by the Governor.  But that is most relevant to the second *Steadfast* factor, which is discussed *infra*. *See Hennessey*, 53 F.4th at 537; *Steadfast*, 507 F.3d at 1254.

> The plan's harm to MOHELA is also a harm to Missouri. MOHELA is a "public instrumentality" of the State. MO. REV. STAT. § 173.360. Missouri established the Authority to perform the "essential public function" of helping Missourians access student loans needed to pay for college. *Ibid.*; *see Todd v. Curators of University of Missouri*, 347 Mo. 460, 464, 147 S.W.2d 1063, 1064 (1941) ("Our constitution recognizes higher education as a governmental function."). To fulfill this public purpose, the Authority is empowered by the State to invest in or finance student loans, including by issuing bonds. §§ 173.385(1)(6)–(7). It may also service loans and collect "reasonable fees" for doing so. §§ 173.385(1)(12), (18). Its profits help fund education in Missouri: MOHELA has provided $230 million for development projects at Missouri colleges and universities and almost $300 million in grants and scholarships for Missouri students.

143 S. Ct. at 2366; *see also id.* ("By law and function, MOHELA is an instrumentality of Missouri: It was created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State. The Secretary's plan will cut MOHELA's revenues, impairing its efforts to aid Missouri college students. This acknowledged harm to MOHELA in the performance of its public function is necessarily a direct injury to Missouri itself.").

Mr. Good points to certain aspects of the Act, as well as Missouri jurisprudence, that he maintains cut against arm-of-the-state status. But his arguments do not persuade us.

*First*, Mr. Good relies on the Act's description of MOHELA as a "body politic and corporate." MO. REV. STAT. § 173.360. Mr. Good is correct that entities described as "bodies corporate" may not always qualify as arms of the state. *See Elam Constr.*, 129 F.3d at 1346 (noting that this characterization under state law

37

weighed against Eleventh Amendment immunity when the state law expressly characterized the entity as a "body . . . corporate"). But that does not necessarily mean that the first factor weighs against arm-of-the-state status. *See Sturdevant*, 218 F.3d at 1167–68 (concluding that although state law described the entity at issue as a "body corporate," the characterization of the entity under state law ultimately pointed in favor of considering the entity to be an arm of the state).

*Second*, we are unconvinced by Mr. Good's reliance on the language that MOHELA is "a *separate* public instrumentality of the state." MO. REV. STAT. § 173.415 (emphasis added). According to Mr. Good, the use of the term "separate" signals that "MOHELA should not be 'identified as *an agency* of the state.'" Aplt.'s Opening Br. at 25 (quoting *Steadfast*, 507 F.3d at 1253). But the word "separate" modifies "public instrumentality of the state." Read naturally, this language does not indicate that MOHELA is separate *from* the state.

*Third*, Mr. Good's comparison of MOHELA to another state-created entity, Missouri's Health and Educational Facilities Authority ("MOHEFA"), suffers from a fatal flaw. In particular, Mr. Good contends that the Missouri Supreme Court has concluded that MOHEFA is a separate entity from the State of Missouri. *See* Aplt.'s Opening Br. at 26–27 (citing *Menorah Med. Ctr. v. Health & Educ. Facilities Auth.*, 584 S.W.2d 73, 78 (Mo. 1979)). His argument seems to be that, based on Missouri case law, state law would characterize MOHELA as an "entity apart from the state" as well. *See* Aplt.'s Opening Br. at 27; Aplt.'s Reply Br. at 5–6.

38

But Mr. Good did not raise this argument before the district court. "We ordinarily deem arguments that litigants fail to present before the district court but then subsequently urge on appeal to be forfeited." *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1259 (10th Cir. 2018). "Typically, such arguments 'may form a basis for *reversal* only if the appellant can satisfy the elements of the plain error standard of review.'" *Id.* at 1260 (quoting *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011)). "Consequently, a litigant's 'failure to argue for plain error [review] and its application on appeal—surely marks the end of the road for an argument for reversal not first presented to the district court'—*viz.*, ordinarily, we will not review the argument at all." *Id.* (alteration in original) (quoting *Richison*, 634 F.3d at 1131); *see also In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1180–81 (10th Cir. 2023) (discussing our waiver and forfeiture framework).

These preservation principles guide us here. Mr. Good's filings in the district court are bereft of *any* mention of MOHEFA, the Missouri Supreme Court's opinion in *Menorah Medical Center*, or any other related decisions. Indeed, there is no mention at all of how Missouri courts characterize state-created entities. And Mr. Good does not argue for plain error review on appeal. We thus exercise our discretion to deem Mr. Good's argument effectively waived and decline to reach it.

In conclusion, the first *Steadfast* factor weighs in favor of arm-of-the-state status, and Mr. Good's arguments to the contrary are unavailing.

39

### b.    The Second Factor: The Entity's Autonomy

We turn next to the second *Steadfast* factor—the entity's autonomy.  The district court concluded that this factor weighed slightly in favor of considering MOHELA to be an arm of the state.  Reviewing de novo, we reach a different conclusion: the autonomy factor weighs *against* arm-of-the-state status.

This is the most complex of the *Steadfast* factors "because it spans a broad range of considerations." *Hennessey*, 53 F.4th at 536.  Relevant sub-factors and considerations include (i) the control of the entity by the governor and the legislature; (ii) whether the entity's employees are classified as state employees; (iii) whether the entity has ownership or control of property; (iv) whether the entity has the ability to form its own contracts with government entities and commercial enterprises; (v) whether the entity has the ability to set its own policies without state oversight; and (vi) whether the entity has the ability to bring suit on its own behalf.  *See id.* at 537–41.  But these "considerations are not an exhaustive list."[17]  *Id.* at 536 n.9.

Despite this blizzard of sub-factors, we must take care not to "'become caught up in the minutiae'": the key inquiry is whether, in light of the "entire relationship" between the entity and the state, the entity "retains substantial autonomy" or if it "operates with . . . guidance or interference" from the state.  *Sikkenga*, 472 F.3d

---

[17]    For example, we have also suggested that it is relevant whether the entity is represented by the state or by private counsel.  *See Sikkenga*, 472 F.3d at 721 n.28; *accord Oberg III*, 804 F.3d at 668.  No party raises this point here.  But if we were to consider it regardless, it would weigh in favor of MOHELA's autonomy because MOHELA is represented by private counsel.

at 720–21, 721 n.28 (quoting *Sturdevant*, 218 F.3d at 1170); *see also Hennessey*, 53 F.4th at 542 (viewing a variety of considerations "together" to determine whether an entity is autonomous); *Couser*, 959 F.3d at 1028 ("Under the second *Steadfast* factor, 'we consider the autonomy accorded the [defendant] under state law,' which 'hinges upon the degree of control the state exercises over [the defendant].'" (alterations in original) (quoting *Steadfast*, 507 F.3d at 1253)).

In undertaking the autonomy analysis, we must "remain cognizant that some ties and oversight will always remain between the state and an entity created by the state"—"even where it was the state's intent to privatize an entity." *Hennessey*, 53 F.4th at 536. Put otherwise, the existence of some connections between a state and a privatized entity that the state created "do not require the privatization be treated as a farce in which the privatized entity enjoys the benefits both of not being the state and so being freed from the regulations that constrain state agencies, and of being the state and so being immune from suit in federal court." *Id.* at 537 (quoting *Takle*, 402 F.3d at 771).

Viewing MOHELA's organization, responsibilities, and powers holistically, we conclude that the district court was mistaken in concluding that the second *Steadfast* factor weighed slightly in favor of arm-of-the-state status. Rather, because MOHELA has a substantial degree of autonomy, this factor weighs *against* MOHELA being considered an arm of the state.

41

### i.    Control by the Governor and the Legislature

We begin by analyzing the aspect of MOHELA's structure that the district court appeared to consider as most important: its control by the Governor of Missouri ("the Governor"). Although we agree with MOHELA that this consideration weighs against autonomy (and thus towards arm-of-the-state status), it does not weigh quite so strongly as MOHELA contends.

Per the Act, the Governor has the authority to appoint (with the advice and consent of the state Senate) five of the seven members of MOHELA's board. *See* MO. REV. STAT. § 173.360. (As to the other two, one is a designee from MDHEWD, and the other is a designee from the Missouri Coordinating Board for Higher Education.) The Governor's appointment authority—and, more specifically, its broad scope—weighs in favor of arm-of-the-state status.[18] *See Colby*, 849 F.3d at 1277; *Watson*, 75 F.3d at 575; *see also Biden*, 143 S. Ct. at 2366 (observing that

---

[18]    The precise make-up of the board is slightly more complex. Per the Act, two of the appointed members are representatives of higher education institutions, two of the appointed members are representatives of lending institutions, and the last appointed member is a representative of the public. *See* MO. REV. STAT. § 173.360. Mr. Good attaches importance to this, arguing that the diversified interests represented on the board weigh in favor of autonomy and against executive control. Mr. Good cites no authority in support of his proposition, and what authority there is cuts against him. *See Sturdevant*, 218 F.3d at 1163, 1168–69 (concluding that the power to appoint a board with "political and geographical diversity requirements" weighed in favor of Eleventh Amendment immunity); *see also Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ.*, 880 F.3d 643, 658 (3d Cir. 2018) (noting that the Governor's appointment power weighs against autonomy even though the makeup of the entity's board included different constituencies).

MOHELA was subject to state "supervision and control" and was "directly answerable" to the State in part because of gubernatorial control over MOHELA).

But the appointment of board members is not decisive as to autonomy because "the power to appoint is not the power to control." *Hennessey*, 53 F.4th at 537 (quoting *Takle*, 402 F.3d at 770). Consequently, also relevant are "(1) the ability of the governor to remove appointees; and (2) the governor's power to block or veto action taken by the board of the entity." *Id.* (citations omitted). Furthermore, it is relevant whether it is the entity or the governor that "select[s] its leadership." *Id.* at 537–38.

Once these considerations are accounted for, it becomes apparent that the degree of gubernatorial control over MOHELA is less than MOHELA suggests. On one hand, the Governor does have removal powers, which weighs against autonomy. The Act provides that board members "may be removed by the governor for misfeasance, malfeasance, willful neglect of duty, or other cause after notice and a public hearing." MO. REV. STAT. § 173.360. This for-cause removal power—though it is limited—weighs in favor of arm-of-the-state status.[19] *See Colby*, 849 F.3d at 1277 (concluding that the autonomy factor weighed in favor of arm-of-the-state

---

[19]    To be sure, an at-will removal power would weigh more strongly against autonomy than the for-cause removal power that the Governor has here. *See Bradley*, 880 F.3d at 659; *United States v. Fla. Birth-Related Neurological Injury Compensation Ass'n*, No. 20-13448, 2022 WL 1180142, at *4 (11th Cir. Apr. 21, 2022) (unpublished). But the Governor's for-cause removal power is still an indicator of state control.

status when the governor had the power to remove board members for cause); *Steadfast*, 507 F.3d at 1254 (same).  So too does the fact that MOHELA "is assigned" to the MDHEWD, *see* MO. REV. STAT. § 173.445, which the parties agree is a state agency within the State's executive branch.  And the requirement that MOHELA is required to "annually file . . . a report of its previous year's income, expenditures and bonds or other forms of indebtedness issued and outstanding" with the MDHEWD, MO. REV. STAT. § 173.445, also cuts against MOHELA's autonomy, *see Hennessey*, 53 F.4th at 535; *Steadfast*, 507 F.3d at 1254–55.[20]  But such reporting requirements appear to be given relatively little weight in the arm-of-the-state analysis.  *See Hennessey*, 53 F.4th at 535; *see also Oberg III*, 804 F.3d at 672.

Moreover, there are also aspects of MOHELA's structure that undercut gubernatorial and legislative control.  In particular, the Act does not give the Governor any power to veto or block actions taken by MOHELA.  *See* MO. REV. STAT. §§ 173.350–173.445; *see also Pellegrino*, 709 F. Supp.3d at 217 ("[T]he State of Missouri has no veto power over MOHELA's regular activities.").  This reduces the extent of the Governor's control over MOHELA.  *See Hennessey*, 53 F.4th at 537 (noting that appointment power is not dispositive as to autonomy and that courts also

---

[20]    *Steadfast* analyzed this consideration under the second (autonomy) factor.  *See* 507 F.3d at 1254–55, while *Hennessey* analyzed it under the third (finances) factor.  *See Hennessey*, 53 F.4th at 535.  The *Hennessey* court, however, did this because of the parties' framing: it elsewhere acknowledged that "it is debatable whether the requirement that an entity report its finances falls within the finances factor rather than the autonomy factor."  *Id.* at 535 n.6.  We believe that it fits better in the "autonomy" factor.

look to "the governor's power to block or veto action taken by the board of the entity"); *Fresenius*, 322 F.3d at 71–72 ("Nor does the statute give the Commonwealth veto power over the decisions of the Board, a key element of control.").

Moreover, MOHELA's board—not the Governor—appoints its leadership: specifically, MOHELA's board can select its own chairman, vice chairman, executive director, secretary, and treasurer. *See* MO. REV. STAT. § 173.370.1. It also has the authority to set compensation for the executive director, secretary, and treasurer. *See id.* And the Board can delegate powers, including hiring powers, to the executive director. *See id.* This weighs in favor of MOHELA's autonomy and against arm-of-the-state status. *See Hennessey*, 53 F.4th at 537–38.

In sum, there is *some* degree of gubernatorial and legislative control over MOHELA. But that level of control is undercut by the fact that the Governor lacks veto power and that MOHELA appoints its own leadership.[21]

---

[21]    MOHELA further argues that the Missouri legislature retains the power to abolish it. The *Biden* Court also found this to be relevant to its standing analysis. *See Biden*, 143 S. Ct. at 2366. This circumstance may well be relevant to the first *Steadfast* factor—how state law characterizes the entity. *See Cas. Reciprocal Exch. v. Mo. Emps. Mut. Ins. Co.*, 956 S.W.2d 249, 255 (Mo. 1997) (en banc) (considering the fact that the general assembly and governor could "abolish" an entity in determining whether it is a public entity under state law). We need not decide that question given that the first *Steadfast* factor already weighs towards arm-of-the-state status. But we do not think that whether the state legislature has the power to abolish MOHELA bears strongly on the autonomy factor. Such a consideration will be present in most, if not every, arm-of-the-state case. And we are reluctant to conclude that the abstract threat of state abolition carries much weight in an inquiry focused on whether an entity is actively controlled—as a practical matter—by the state.

### ii. Classification of Employees

Another consideration within the second *Steadfast* factor is "how employees of the entity are classified, including whether they are 'state' employees, whether they *must* partake in state retirement and benefit programs, and whether they are subject to a state merit system for purposes of hiring." *Hennessey*, 53 F.4th at 538; *see also Steadfast*, 507 F.3d at 1254.

Here, the import of this subfactor may be discerned with little difficulty. As MOHELA conceded at oral argument, its "employees are not state employees in the classic sense." Oral Arg. Recording at 18:29–18:36. And there is no evidence that its employees are subject to the State's merits system for hiring or the State's retirement plan. Instead, MOHELA has the power to hire and "fix[]" the compensation for its employees. *See* MO. REV. STAT. § 173.370. And, as MOHELA admits, even the compensation for MOHELA's officers "does not come directly from state coffers." Aplee.'s Resp. Br. at 29. This consideration thus indicates that MOHELA enjoys a degree of autonomy.

### iii. Ownership and Control of Property

Also relevant to the autonomy inquiry is "whether the entity has ownership and control over property." *Hennessey*, 53 F.4th at 539. This consideration weighs in favor of MOHELA's autonomy. The Act grants MOHELA the authority to "acquire, hold and dispose of personal property to carry out its purposes." MO. REV. STAT. § 173.385.1(14). It can also accept gifts, appropriations, grants, and bequests, and is entitled "[t]o maintain an office at such place or places in the state of Missouri

46

as it may designate." *Id.* § 173.385.1(5), (10). This relatively unfettered discretion to own property weighs in favor of MOHELA's autonomy. *See Duke*, 127 F.3d at 979; *cf. Hennessey*, 53 F.4th at 539–40 (noting that it weighed against autonomy when an entity was not permitted to own real property); *Steadfast*, 507 F.3d at 1254 (concluding that it weighed against autonomy that the entity's acquisition and sale of property was "circumscribe[d]" by state law).

MOHELA raises several counterarguments,[22] but only one merits significant discussion here. Specifically, MOHELA argues that there are restrictions on its ability to dispose of property because the MDHEWD must give approval before MOHELA can sell certain guaranteed student loan notes. MOHELA is correct on this score: although it has seemingly unconstrained ability to dispose of any other acquired property, "any agreement to sell student loan notes guaranteed under section 173.110 [in other words, guaranteed by the State of Missouri] shall be subject to prior approval of [MDHEWD]." MO. REV. STAT. § 173.385.1(8). In contrast to MOHELA's general authority to own property, this would weigh *against* autonomy. *See Steadfast*, 507 F.3d at 1254 (discussing how state law regulated the entity's acquisition and sale of property); *Sturdevant*, 218 F.3d at 1168 (noting that state

---

[22]     For example, MOHELA points to restrictions on its ability to undertake certain activities, as well as its duty to make required distributions to the Lewis and Clark Discovery Fund, which is discussed *infra*. These restrictions are not irrelevant to the autonomy inquiry; however, it is hard to see how they have anything to do with MOHELA's ability to own and dispose of property. We will address these arguments elsewhere in our discussion of the autonomy factor.

"review and approval" of setting tuition and fees weighed against a finding of autonomy).

But the fact that certain note sales[23] are subject to MDHEWD approval does not change the reality that MOHELA has substantial discretion to acquire and dispose of property. Rather, this is only a carveout from the general rule that MOHELA has substantial autonomy with regard to the acquisition and disposition of property. And such a carveout does not change the overall direction in which this subfactor points. *See Hennessey*, 53 F.4th at 541 n.12 (concluding that a carveout about abortion procedures from an entity's general control over its own affairs did not change the weight of the autonomy factor); *cf. Oberg III*, 804 F.3d at 672–73 (concluding that the necessity for state approval of certain payments did not change the reality that a student loan servicer managed its own affairs).[24]

---

[23] At times, MOHELA seems to argue that its ability to sell *all* student loan notes is subject to MDHEWD approval. To the extent that MOHELA intends to make this argument, MOHELA misreads the Act. Under the Act's plain language, only the sale of guaranteed student notes is subject to MDHEWD approval. *See* Mo. Rev. Stat. § 173.385.1(8); *see also Dykes*, 2021 WL 3206691, at *3 (making clear that only "certain" student loan sales are subject to MDHEWD approval); *Gowens*, 2020 WL 10180669, at *3 (same); *Pellegrino*, 709 F. Supp. 3d at 218 (noting that restrictions only affected "some" of the bonds issued by MOHELA). And, finally, this argument would be inconsistent with MOHELA's own modest and narrow representation to the district court that "[t]here are also statutory restrictions on MOHELA selling *certain* loans without MDHE[WD] approval." Aplt.'s App. at 63 (emphasis added).

[24] *See also Gaffney v. Ky. Higher Educ. Student Loan Corp.*, No. 3:15-cv-01441, 2016 WL 3688934, at *7 (M.D. Tenn. July 12, 2016) (unpublished) (concluding that the necessity of state approval for specific, discrete activities did not change the overall fact that the State lacked control over the student loan servicer at issue); *Castro v. Ky. Higher Educ. Student Loan Corp.*,

And this carveout applies only to situations in which the State is acting as a guarantor of the loans. The requirement for State approval thus protects the State's interest as guarantor more than it operates as a substantive restraint on MOHELA's autonomy. Finally, it is unclear just how important this carveout is to MOHELA's affairs. MOHELA (which bears the burden of showing arm-of-the-state status) has not clearly explained how many of its loan sales are affected by this restriction. In sum, although restrictions on MOHELA's ability to sell guaranteed student loan notes are relevant, MOHELA retains substantial power to acquire and dispose of property—an indicator of autonomy.

### iv.    Ability to Form Contracts

"Another consideration[] . . . is an entity's ability to form its own contracts with government entities and commercial enterprises." *Hennessey*, 53 F.4th at 540. As in *Hennessey*, "[t]his consideration overwhelmingly favors [the entity] having autonomy from the state." *Id.* The Act permits MOHELA "[t]o make and execute contracts, releases, compromises, and other instruments necessary or convenient for the exercise of its powers, or to carry out its purpose," MO. REV. STAT. § 173.385.1(11), and "[t]o enter into agreements or other transactions with any federal or state agency, any person and any domestic or foreign partnership,

---

No. 16-24690-CIV-ALTONAGA, 2017 WL 588379, at *6 (S.D. Fla. Feb. 14, 2017) (unpublished) (same). *But see Skidmore v. Access Grp., Inc.*, 149 F. Supp. 3d 807, 815 (E.D. Mich. 2015) (concluding that the student loan entity at issue lacked autonomy in part because it "must obtain approval from the Kentucky General Assembly prior to issuing bonds under certain circumstances").

49

corporation, association or organization," *id.* § 173.385.1(15). MOHELA also has the authority to "sell or enter into agreements to sell student loan notes," *id.* § 173.385.1(8)—although, as noted above, agreements to sell student loans guaranteed by the State are "subject to prior approval" by the MDHEWD. On balance, MOHELA's ability to form contracts weighs in favor of autonomy.

### v.    Ability to Set Policies

"An entity's ability to set its own policies, without oversight and control from the state or a state agency, is instrumental in the entity being autonomous from the state." *Hennessey*, 53 F.4th at 541. "Conversely, if day-to-day operations of an entity were controlled by the state, autonomy would almost certainly not exist." *Id.*

This consideration weighs in favor of MOHELA's autonomy. In particular, MOHELA is expressly given the power to "adopt bylaws for the regulation of its affairs and the conduct of its business." MO. REV. STAT. § 173.385.1(2); *see Hennessey*, 53 F.4th at 541 (considering the entity's ability to adopt rules, procedures, and bylaws); *cf. Sikkenga*, 472 F.3d at 720 (noting that an entity's "day-to-day operations [were] independent" when the board of directors, not the state, "'set[] policies and operational objectives'"). Likewise, MOHELA has "exclusive control and management" over its own assets. MO. REV. STAT. § 173.425. Finally, MOHELA has the authority to appoint an executive director and to "fix the powers and duties of its executive director as it may from time to time deem proper and necessary." MO. REV. STAT. § 173.370.1; *see also Hennessey*, 53 F.4th at 541

50

(noting that "the president, who is selected by and serves at the pleasure of the board, is tasked with supervising and managing UKHA's affairs").

True, state law dictates some of MOHELA's duties. For example, MOHELA is required to make financial distributions to the Lewis and Clark Discovery Fund—a fund within the Missouri State Treasury that is used to support capital projects at public colleges and universities and to support the Missouri technology corporation's ability to work with colleges in developing commercially viable technological products. *See* MO. REV. STAT. §§ 173.385.2, 173.392.1–.2. But to the extent that MOHELA's duty to pay into the Lewis and Clark Discovery Fund remains ongoing,[25] this is a relatively small exception to the general rule of autonomy. And MOHELA's obligation to contribute to the Lewis and Clark Discovery Fund is not its primary mission; in fact, MOHELA is given power—albeit limited—to delay distributions to the fund if it concludes that "any such distribution may materially adversely effect [sic] the services and benefits provided Missouri students or residents in the ordinary course of the authority's business, the borrower benefit programs of the authority, or the economic viability of the authority." *Id.* § 173.385.2. Simply put, MOHELA's

---

[25]     From the face of the Act, it would seem that MOHELA's obligation to make payments to the Lewis and Clark Discovery Fund has expired. *See* MO. REV. STAT. § 173.385.2, .4; *see also Perkins*, 2020 WL 13120600, at *4. But, at least according to one court, that is not the case because MOHELA "made the decision pursuant to the legislation to delay the required quarterly payments," so an obligation to make contributions still remains. *Dykes*, 2021 WL 3206691, at *4. For purposes of this appeal, we assume—as MOHELA suggests, *see* Aplee.'s Resp. Br. at 31–32— that MOHELA's duty to make contributions to the Lewis and Clark Discovery Fund remains ongoing.

obligation to make distributions to the Lewis and Clark Discovery Fund is insufficient for "day-to-day operations" of MOHELA to be "controlled by the state." *Hennessey*, 53 F.4th at 541.

MOHELA also relies upon several other limitations in the Act as counting against its ability to manage its own affairs. These include limitations on the total number of Stafford loans, limitations on MOHELA's investment power, the duty to make annual reports, and limitations on the type, terms, and nature of bond issuances. But, based on the language of the Act, these limitations are relatively minor and do not carry much weight in the analysis. *See Oberg III*, 804 F.3d at 673 (discounting restrictions that operated at "the administrative edges" of an entity's day-to-day affairs, such as restrictions on the manner in which bills are paid or contracts are reviewed because they "do not intrude on [the entity's] exercise of its substantive discretion"). As the Fourth Circuit explained in *Oberg III*, "control over matters of substance is what matters" in determining if an entity is subject to state control. 804 F.3d at 673. That control is not present here. Overall, MOHELA retains control over its day-to-day affairs and can set its own policies.

### vi.    Ability To Sue and Be Sued

Yet another consideration is "the ability of the entity to sue and be sued, with the existence of such ability supporting a finding that the entity is autonomous." *Hennessey*, 53 F.4th at 541. Here, the Act expressly provides that MOHELA has the authority "[t]o sue and be sued and to prosecute and defend, at law or in equity, in any court having jurisdiction of the subject matter and of the parties." MO. REV.

52

STAT. § 173.385.1(3).  And, as a matter of fact, MOHELA has brought cases on its own behalf.  *See, e.g., Higher Educ. Loan Auth. of the State of Mo. v. Wells Fargo Bank, N.A.*, No. 4:10CV01230 AGF, 2011 WL 6010683 (E.D. Mo. Dec. 2, 2011) (unpublished); *see also Hennessey*, 53 F.4th at 541 (noting that the entity at issue had in fact been a party to litigation).  This consideration thus weighs in favor of MOHELA's autonomy.

### vii.    Weighing the Considerations

After reviewing the various subfactors described above in their totality, we conclude that, in light of the entire relationship between MOHELA and the State of Missouri, MOHELA "retains substantial autonomy in its operations, and operates with little, if any guidance or interference from . . . the State."  *Sikkenga*, 472 F.3d at 720–21, 721 n.28 (citing *Sturdevant*, 218 F.3d at 1170).  As explained above, MOHELA has largely unfettered discretion to enter into contracts, to hold and sell property, and to bring suit on its own behalf.  MOHELA also retains a substantial degree of oversight authority for its day-to-day operations, and it has the power to hire employees, who are *not* employees of the State of Missouri.  And although the Governor exercises some degree of control over MOHELA through his appointment and removal powers, that control is undercut by the Governor's lack of veto power and MOHELA's ability to select its own leadership.  Finally, even though there are some statutory restrictions on MOHELA's activities—and there are some connections between MOHELA and the State—that does not change our ultimate conclusion that MOHELA has a substantial degree of autonomy.  *See Hennessey*,

53 F.4th at 536–37 (noting that "some ties and oversight will always remain between the state and an entity created by the state").

Thus, the second *Steadfast* factor weighs against arm-of-the-state status, and the district court was mistaken in concluding otherwise.

### c.    Factor Three: Finances

The third *Steadfast* factor requires an inquiry into the independence of the entity's finances and the extent to which the state financially supports the entity. *See Hennessey*, 53 F.4th at 533, 535 n.7; *see also Hess*, 513 U.S. at 51 (noting that assessing an entity's financial independence involves making the following inquiry: "[i]f the expenditures of the [entity] exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the [entity]?").

As with the autonomy factor, multiple considerations are relevant to the finances factor.  One key component is to "look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf." *Id.* at 528 (quoting *Steadfast*, 507 F.3d at 1253).  "The inability of an entity to levy taxes, combined with its receipt of all or most of its funding from the state, will serve as a strong indicator that the entity is an arm of the state." *Id.* at 533.  "Likewise, if an entity cannot levy taxes *and* its ability to issue bonds is subject to state review or state procedures, this is also an indicator that the entity is an arm of the state." *Id.*  "Conversely, an entity's ability to generate its own revenue so as not to need financial assistance from the state supports a finding that the entity is not an arm of the state." *Id.*

We also consider "the existence, or lack thereof, of regulations on how an entity may handle its finances and whether the entity's funds are 'classified as "public funds."'" *Id.* (quoting *Steadfast*, 507 F.3d at 1254). Part of this consideration turns on whether the entity has the authority to manage its own finances without state interference. *See id.* at 533–34.

Finally, as discussed in more detail *infra*, we consider whether the state bears legal liability for the entity's debts. *See Hess*, 513 U.S. at 46 (considering whether states bore legal liability for the debts of an entity that was allegedly an arm of two states: New York and New Jersey); *Duke*, 127 F.3d at 978 (considering "the impact on the state treasury" and "the legal liability of the state for the entity's debts"); *see also Hennessey*, 53 F.4th at 534–35 (considering whether the state would be legally liable for bonds issued by the entity). This legal-liability inquiry includes—but is not limited to—examining whether the state bears legal liability for a judgment against the entity (in other words, whether state funds would be used to pay a judgment against the entity).

For the reasons given below, we agree with Mr. Good that the finances factor weighs against arm-of-the-state status for MOHELA. In particular, MOHELA receives no direct financial assistance; MOHELA has the ability to generate its own revenue without meaningful State oversight; MOHELA retains the exclusive power to manage its own funds; and the State bears no legal liability for MOHELA's debts—including judgments against MOHELA.

### i.    Lack of Financial Assistance from the State

Looking first to "the amount of state funding the entity receives," *Hennessey*, 53 F.4th at 528 (quoting *Steadfast*, 507 F.3d at 1253), it is clear that MOHELA receives no direct financial assistance from the State.  Indeed, MOHELA concedes this point.  In this regard, MOHELA's expenses "shall be payable solely from funds provided" by the performance of its duties under the Act.  MO. REV. STAT. § 173.420.  With that said, the fact that MOHELA does not receive direct financial assistance from the State is not dispositive as to the third *Steadfast* factor.  *See Steadfast*, 507 F.3d at 1255 (concluding that the finances factor weighed in favor of arm-of-the-state status even though the entity at issue did not receive appropriations).

### ii.    MOHELA's Ability to Generate Revenue

"[A]n entity's ability to generate its own revenue so as not to need financial assistance from the state supports a finding that the entity is not an arm of the state." *Hennessey*, 53 F.4th at 533.  That is the case here: MOHELA can generate its own revenue.  And its ability to collect this revenue is not subject to any meaningful degree of State oversight.

MOHELA has multiple relevant revenue streams—all of which are essentially independent from the State.  By statute, MOHELA is entitled to "collect reasonable fees and charges in connection with making and servicing its loans, notes, bonds, obligations, commitments, and other evidences of indebtedness," as well as for other services.  MO. REV. STAT. § 173.385.1(12).  "Such fees and charges shall be used to pay the costs of the authority."  *Id.*  Additionally, MOHELA can also generate funds

through investment. *See id.* § 173.385.1(13). To be sure, the Act limits MOHELA to investing in certain things, such as "obligations of the state of Missouri or of the United States," and "certificates of deposit or time deposits of federally insured banks, or federally insured savings and loan associations." *Id.* But MOHELA's investment authority provides an independent source of income and is not subject to state review.

Additionally, MOHELA has the authority to issue bonds to obtain funds for the purchase and financing of student loans. Because it cannot levy taxes and receives no direct financial support from the State, MOHELA's ability to issue bonds is crucial. Generally, "if an entity cannot levy taxes *and* its ability to issue bonds is subject to state review or state procedures, this is also an indicator that the entity is an arm of the state." *Hennessey*, 53 F.4th at 533.

The Act grants MOHELA broad authority, however, to issue bonds to carry out its primary duties. Specifically, MOHELA has the authority "[t]o issue bonds or other forms of indebtedness to obtain funds to purchase student loan notes or finance student loans, or both." MO. REV. STAT. § 173.385.1(6). By statute, "[s]uch bonds issued by the authority shall be payable solely from and secured by a pledge of revenues derived from or by reason of the ownership of student loan notes and investment income or as may be designated in a bond resolution." *Id.* § 173.390; *see also id.* §§ 173.385.1(6), 173.405. MOHELA may also "cause proceeds of any bond or other form of indebtedness to be used to purchase student loan notes or finance student loans, or both." *See id.* § 173.385.1(7). And MOHELA may "take any

57

necessary actions" to be qualified to issue both tax-exempt and non-tax-exempt bonds. *See id.* § 173.385.1(16)–(17).

It is true that MOHELA is limited to issuing bonds backed by its revenue, and there are some restrictions on what types of bonds it may issue. *See id.* § 173.390. But, overall, MOHELA has a great deal of discretion in setting the terms of the bonds it issues. It may set the interest rate, the form and denomination, and when and where the bonds must be paid. *See id.* And MOHELA may sell the bonds "at public or private sale for such price" as it determines. *See id.* Overall, MOHELA's broad authority to issue bonds for the key task of purchasing and financing of student loan notes—which is clearly germane to MOHELA's "main function . . . as the sole state entity devoted to student loan financing," Aplee.'s Resp. Br. at 37—is an indicator that its finances are independent from the State's. *See Hennessey*, 53 F.4th at 534 (noting that the entity "has seemingly unconstrained authority to issue bonds"); *Colby*, 849 F.3d at 1277 ("[T]he State Board of Stock Commissioners is entitled to issue bonds worth up to $10 million to pay the Division's expenses. The self-funding and power to issue bonds cut against Eleventh Amendment immunity." (citations omitted)).

Having established that MOHELA has broad authority to issue bonds, the inquiry turns to whether its ability to do so is subject to State review or procedures. We conclude that it is not subject to such process—at least not to any meaningful degree. Besides some baseline limitations on what kinds of bonds can be issued, there is no indication in the Act that MOHELA's authority to issue the bonds "is

subject to state review or state procedures." *Hennessey*, 53 F.4th at 533; *cf. Steadfast*, 507 F.3d at 1255 (concluding that an entity's authority to issue revenue bonds "subject to the oversight of the State Bond Oversight Commission" weighed in favor of arm-of-the-state status); *Sturdevant*, 218 F.3d at 1169–70 (concluding that it weighed in favor of arm-of-the-state status when the entity's authority to issue bonds was "to be carried out in accordance with legislative appropriations" and was "under the supervision" of a state agency). We reach this conclusion even though MOHELA is required to report its bond revenues under MO. REV. STAT. § 173.445, which we do not deem to be a significant constraint. *See Hennessey*, 53 F.4th at 535.

MOHELA insists that its power to issue bonds is "subject to state limitations and review." Aplee.'s Resp. Br. at 34. Besides the minimal limitations already discussed and the fact that bonds are issued to generate funds for the purchase and financing of student loans, MOHELA points primarily to the statutory requirement that the State approve the sale of certain student loan notes.[26] Specifically, it argues that "the contingency that the MDHE[WD] approve MOHELA's ability to sell student loans, which is needed for MOHELA's bond financing" weighs against financial independence. Aplee.'s Resp. Br. at 30 (citation omitted) (quoting

---

[26]    MOHELA also argues that "[a]bsent the statutory mandate to ensure that Missouri postsecondary students have access to student loans, MOHELA would have no source of funds." Aplee.'s Resp. Br. at 34. This argument misses the mark. It is a truism that a state-created entity would necessarily derive its revenues from its statutory mandate. And the fact that MOHELA derives its revenues from student loan duties that a state statute authorizes does not go to the heart of the finances factor—that is, whether MOHELA's funds are independent from the State's.

MO. REV. STAT. § 173.385.1(8)).  MOHELA reasons that, as a consequence, "MOHELA's funding is, therefore, inextricably tied to the State of Missouri where its ability to issue bonds is subject to state limitations and review, and where MOHELA cannot levy taxes."  *Id.* at 34.

We cannot agree.  To the extent that MOHELA argues that MDHEWD approval is necessary for *all* student loan sales, it misreads the statute, which requires MDHEWD approval only for the sale of student loan notes that the State of Missouri guarantees.  *See* MO. REV. STAT. § 173.385.1(8); *see also supra* n.23.  Moreover, it is unclear from the record before us how much of an effect this provision actually has on MOHELA's revenues.  There is also a paucity of evidence on what the MDHEWD's review actually looks like and whether it actually constitutes a meaningful review.  *Cf. Oberg III*, 804 F.3d at 663 (giving little weight to a review process that, as a practical matter, did not constrain the entity's fiscal discretion).  And the adverse effects of these record holes necessarily work against MOHELA, which bears the burden of proof concerning the arm-of-the-state inquiry.  *See, e.g.*, *Hennessey*, 53 F.4th at 524 (noting that "the burden falls on the entity asserting it is an arm of the state").

More fundamentally, MOHELA's argument misses the mark: the necessity for State approval on its ability to sell certain student loan notes—even if those notes are ultimately used as collateral—does not necessarily translate to some significant level of State oversight regarding MOHELA's ability to issue bonds to raise revenue; as

noted, there is no direct oversight of bond issuance. *Cf. Steadfast*, 507 F.3d at 1255; *Sturdevant*, 218 F.3d at 1169–70. And MOHELA cites no authority to the contrary.

There is yet another indicator that MOHELA's ability to generate revenue through bond sales is independent of the State. In particular, any bond issued by MOHELA "is the sole responsibility of" MOHELA and is "not backed" by the State. *See Hennessey*, 53 F.4th at 534 ("It is also abundantly clear that any bond issued by [the entity] is the sole responsibility of [the entity] and not backed by the State of Kansas."); *Elam Constr.*, 129 F.3d at 1346 (deeming it relevant to the arm-of-the-state analysis that bonds issued by the entity did not create any indebtedness or liability for the state or a political subdivision thereof).

The Act goes into quite a bit of detail on this point, providing that MOHELA's "[b]onds or other forms of indebtedness . . . shall not be deemed to constitute a debt or liability of the state or of any political subdivision thereof or a pledge of the full faith and credit of the state or of any such political subdivision." MO. REV. STAT. § 173.410; *see also* MO. REV. STAT. § 173.385.1(6) ("Such bonds or other forms of indebtedness shall not constitute a debt or liability of the state of Missouri or of any political subdivision thereof."). The Act also provides:

> Nothing in this section shall be construed to authorize the authority to create a debt of the state within the meaning of the constitution or statutes of the state of Missouri, and each bond or other form of indebtedness issued by the authority shall be payable and shall state on its face that it is payable solely from the funds pledged for its payment in accordance with the bond resolution authorizing its issuance.

*Id.* § 173.410.  Finally, the Act makes clear that "[t]he state shall not be liable in any event for the payment of the principal of or interest on any bonds" and that the State cannot be held liable for any breach of agreements or pledge that MOHELA makes. *Id.*

In sum, looking at the financial structure of MOHELA and its ability to generate revenue, it is clear that MOHELA was intended to be a self-sufficient enterprise.  *See Sikkenga*, 472 F.3d at 721; *Hess*, 513 U.S. at 52.  It generates revenue through fee collection, investment, and the sale of bonds that do not constitute an obligation of the State of Missouri.  Overall, the State is not significantly involved in this revenue-generation process.  Accordingly, MOHELA's ability to generate revenue and pay its own bills weighs in favor of its financial independence and against arm-of-the-state status.

### iii.    Control Over MOHELA's Funds

MOHELA's revenues and assets are not considered to be public funds.  *See Hennessey*, 53 F.4th at 533; *Steadfast*, 507 F.3d at 1254.  The Act expressly provides that "[n]o asset of [MOHELA] shall be considered to be part of the revenue of the state . . . and no asset of [MOHELA] shall be required to be deposited into the state treasury, and no asset of [MOHELA] shall be subject to appropriation by the general assembly," except for the amounts distributed to the Lewis and Clark Discovery Fund.  Mo. Rev. Stat. § 173.425.  Moreover, "[s]tudent loan notes purchased or

financed shall not be considered to be public property." *Id.* This weighs against arm-of-the-state status.[27] *See Hennessey*, 53 F.4th at 533.

In a similar vein, it is clear beyond peradventure that—except for the amounts required to be deposited into the Lewis and Clark Discovery Fund—MOHELA retains exclusive control over its assets. The Act provides that "[t]he assets of the authority shall remain under the exclusive control and management of the authority to be used as required pursuant to [the Act], except for those amounts distributed by the authority to the Lewis and Clark discovery fund." MO. REV. STAT. § 173.425. This is a strong indication that MOHELA does not have arm-of-the-state status. *See Hennessey*, 53 F.4th at 534 ("[I]t is clear the legislature envisioned that [the entity] would have its own funds and would manage those funds outside of the state treasury."); *cf. Steadfast*, 507 F.3d at 1255 (noting that all of the entity's revenues were state funds, so the finances factor weighed in favor of arm-of-the-state status).[28]

---

[27]     One provision of the Act provides that nothing in the Act "shall be construed to deprive the state and its governmental subdivisions of their respective powers over assets of the authority or to impair any power thereof of any official or agency of the state and its governmental subdivisions which otherwise may be provided by law." MO. REV. STAT. § 173.420. In passing, MOHELA asserts that this provision means that the State reserved its authority over all of MOHELA's assets. Even if we were to overlook the undeveloped nature of this argument, we would be unconvinced. As Mr. Good notes, this provision seems to present "merely a rule of construction." Aplt.'s Reply Br. at 12. The rest of the Act makes clear that the State lacks meaningful authority or control over MOHELA's assets. *See, e.g.*, MO. REV. STAT. § 173.425.

[28]     Indeed, the wall of separation between MOHELA funds and State funds is underscored by MO. REV. STAT. § 173.386, which prohibits MOHELA from using its assets to pay any debts incurred by the State.

A comparison with our opinion in *Haldeman*, 32 F.3d at 473–74, is instructive. Like MOHELA, the Farm Loan Board at issue in that case derived its revenue from loans. *See id.* But unlike MOHELA, the interest it made was deposited in a trust fund created by statute and "strictly controlled by the legislature." *Id.* at 473. Thus, it had no "autonomy over its budget and funds." *Id.* at 474. The obverse is largely true here. MOHELA has the exclusive authority to handle its own finances and, for the most part, is not required to give control over its assets to the State.

The Lewis and Clark Discovery Fund, discussed above with respect to the autonomy factor, does not change this analysis. According to MOHELA, the existence of the Lewis and Clark Discovery Fund weighs in its favor on the finances factor because "[t]he State of Missouri can, and has, imposed financial obligations on MOHELA," such as requiring it to contribute $350 million to the State via the Lewis and Clark Discovery Fund. Aplee.'s Resp. Br. at 35.[29]

Assuming that MOHELA's duty to pay into the Lewis and Clark Discovery Fund is still ongoing, *see supra* n.25, it still does not move the needle with respect to the third *Steadfast* factor. Simply put, the Lewis and Clark Discovery Fund is a discrete exception to the general wall of separation between the finances of MOHELA and the State. *See* MO. REV. STAT. § 173.425 (providing that MOHELA's

---

[29]    MOHELA also points to the fact that, when requested by the State, it provided scholarship and grant funding. But it appears that MOHELA is not statutorily mandated to provide scholarship funding; rather, it was a voluntary choice. *Cf. Pellegrino*, 709 F. Supp. 3d at 217; *Dykes*, 2021 WL 3206691, at *4. Thus, the scholarship contributions are of limited—if any—weight in the analysis.

64

assets are not to be considered a part of the state treasury "except for those amounts distributed by [MOHELA] to the Lewis and Clark discovery fund"). And, in fact, MOHELA can delay (within certain limitations) its contributions to the Lewis and Clark Discovery Fund if financially necessary. *See id.* § 173.385.2. Consequently, in our view, MOHELA's obligation to pay into the Lewis and Clark Discovery Fund does not change the reality that, for the most part, the finances of MOHELA and the State are entirely separate.

### iv.    Legal Liability for MOHELA's Debts and Liabilities

Another consideration under the finances factor of *Steadfast* is whether the state bears legal responsibility for the entity's debts or liabilities. *See Duke*, 127 F.3d at 978 (considering "the legal liability of the state for the entity's debts"); *Hess*, 513 U.S. at 37 ("The States[] . . . bear no legal liability for Port Authority debts; they are not responsible for the payment of judgments against the Port Authority or PATH."); *accord Kohn*, 87 F.4th at 1036; *Irizarry-Mora*, 647 F.3d at 15.

As we discussed above, the State bears no legal liability for the bonds issued by MOHELA, and MOHELA is not authorized to create any debt for which the State would be responsible. *See* MO. REV. STAT. § 173.410; *see also* MO. REV. STAT. § 173.385.1(6). The fact that these bonds are the "sole responsibility of" MOHELA and are "not backed" by the State weighs in favor of considering MOHELA's finances to be independent from the State's. *See Hennessey*, 53 F.4th at 534.

Further, as we will explain, it is relevant to our inquiry under the finances factor that the State would not be liable for a judgment against MOHELA.

MOHELA concedes that the State would not be liable for a judgment against it.  *See* Aplee.'s Resp. Br. at 12 ("[T]he State of Missouri is not directly responsible in the first instance for a judgment against MOHELA[] . . . ."); *id.* at 43 ("While the State of Missouri is not directly responsible in the first instance for a judgment against MOHELA[] . . . .").  But MOHELA argues that whether the State would be liable for a judgment against it is not relevant to the finances factor.  MOHELA reasons that our recent opinion in *Hennessey*, 53 F.4th 516, made clear that whether the state would be liable for a judgment against the entity seeking arm-of-the-state status relates to the twin reasons underlying the Eleventh Amendment—which are reached *only if* the four *Steadfast* factors conflict and point in opposing directions.

We disagree with MOHELA's reading of *Hennessey*, and, more generally, we conclude that whether a state would be liable for a judgment against the entity remains relevant to the third *Steadfast* factor.  It is true that *Hennessey* itself discussed the judgment-liability issue only in its examination of the Eleventh Amendment's twin factors—that is, at the second step of the two-step analysis.  *See* 53 F.4th at 528–29.  However, it does not necessarily follow that *Hennessey* intended for the judgment-liability issue to be addressed exclusively in the second phase of the analysis.  There are no affirmative statements in *Hennessey* to this effect.  And we do not think that such a narrow and restrictive reading of *Hennessey* is the best one.

In our view, the relevance of this judgment-liability issue to the third *Steadfast* factor is patent.  Therefore, as a matter of logic, we would be wary of interpreting *Hennessey* in this narrow and restrictive way.  Specifically, the third *Steadfast* factor

66

looks to whether a state's finances are structured to be independent from an entity's finances. There is an obvious overlap between (1) the question of whether an entity's finances and a state's finances are separate, and (2) the related question of whether a state's finances could be impacted by a judgment against the entity. *See Sturdevant*, 218 F.3d at 1169 (noting the "overlap" between the question of whether a judgment against an entity would be satisfied out of a state's treasury and issues of the entity's financial independence through receipt of state funding and any ability to issue bonds and levy taxes); *see also Watson*, 75 F.3d at 575 ("We move then to the second area of inquiry: the degree of state funding and the [entity's] ability to issue bonds and raise taxes, i.e., the likelihood that a judgment against the [entity] might be paid from state funds."). Put differently, whether a state bears legal liability for a judgment against an entity is closely interrelated with the question of whether the entity is financially separate and independent from the state—which is the crux of the third *Steadfast* factor.

Moreover, we must "endeavor to interpret our cases in a manner that permits them to coexist harmoniously." *Mier-Garces*, 967 F.3d at 1018 (quoting *Hansen*, 929 F.3d at 1254). Looking at the entire arc of our arm-of-the-state jurisprudence, we would run afoul of this rule if we were to interpret *Hennessey* in the strained manner that MOHELA urges. It is simply irreconcilable with our precedent to relegate consideration of the judgment-liability issue to only a second-step concern— one that would be reached only if the *Steadfast* factors point in different directions. In particular, in our cases involving the *Steadfast* formulation of the relevant factors,

67

we have specifically considered whether a state bears legal liability for a judgment against an entity as part of the third, finances factor.  *See Baca v. Colo. Dep't of State*, 935 F.3d 887, 926 (10th Cir. 2019) ("With respect to the entity's finances, we also must look to whether a 'money judgment sought is to be satisfied out of the state treasury,' focusing 'on legal liability for a judgment, rather than [the] practical, or indirect, impact a judgment would have on a state's treasury.'" (alteration in original) (quoting *Sturdevant*, 218 F.3d at 1164)), *rev'd on other grounds*, 591 U.S. 655 (2020) (per curiam) (mem.); *Steadfast*, 507 F.3d at 1255 & n.3 (noting, during the consideration of the third factor, that "[a]ny judgment against the GRDA must be paid out of the GRDA's revenues," which were "state funds," and observing that "[t]he focus of our financial analysis is on whether state funds are at stake").

In a similar vein, even when we have not specifically applied the *Steadfast* factors, we have *repeatedly* indicated that whether the state bears legal liability for a judgment against the entity is an important consideration in our arm-of-the-state analysis.  *See, e.g.*, *Colby*, 849 F.3d at 1276–78; *Sikkenga*, 472 F.3d at 718; *Sturdevant*, 218 F.3d at 1163, 1165–66; *Duke*, 127 F.3d at 980–81.  And we discussed this important consideration without any suggestion that it comes into play only after analysis of all other relevant factors is complete.  *See Sikkenga*, 472 F.3d at 718, 721 (considering the twin reasons underlying the Eleventh Amendment after first discussing the judgment-liability issue); *cf. Duke*, 127 F.3d at 978, 980–81 (stating that the twin reasons underlying the Eleventh Amendment become the focus after indicators of immunity, including the impact on the state treasury, are

68

considered). In the interest of ensuring that our precedents coexist harmoniously, we decline to read *Hennessey* as determining that the consideration of the state's legal liability for a judgment—which our precedents have established is an undisputedly important component of the arm-of-the-state test—should only take place at the second step of the analysis.

Moreover, the approach that MOHELA urges is simply inconsistent with Supreme Court case law. In *Hess v. Port Authority Trans-Hudson Corp.*, the Court first looked to "[i]ndicators of immunity" in determining whether the Port Authority was entitled to Eleventh Amendment immunity. 513 U.S. at 44. One such indicator was that the States at issue were "not responsible for the payment of judgments against the Port Authority." *Id.* at 46. Notably, the Supreme Court undertook this inquiry *before* it focused its attention on "the Eleventh Amendment's twin reasons for being." *Id.* at 47. Thus, it would be inconsistent with Supreme Court case law to accept MOHELA's argument that a state's liability for a judgment against an entity can *only* be considered in the context of analyzing the Eleventh Amendment's twin reasons—and then *only if* a prior determination is made that the *Steadfast* immunity indicators point in different directions.

Our sister circuits also overwhelmingly consider whether a state would be liable for a judgment against the entity claiming arm-of-the-state status. And they do so without any indication that this consideration only comes into play after all other indicia of immunity are considered. *See, e.g.*, *In re Entrust Energy, Inc.*, 101 F.4th 369, 383–84 (5th Cir. 2024) (Fifth Circuit); *Kohn*, 87 F.4th at 1030, 1036 (Ninth

69

Circuit); *DuPage Reg'l Off. of Educ. v. U.S. Dep't of Educ.*, 58 F.4th 326, 349 (7th Cir. 2023) (Seventh Circuit); *Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ.*, 880 F.3d 643, 655 (3d Cir. 2018) (Third Circuit); *Oberg III*, 804 F.3d at 650–51, 676 (Fourth Circuit); *P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 878–79 (D.C. Cir. 2008); *Woods*, 466 F.3d at 249 (Second Circuit); *see generally* 13 Wright, Miller, & Freer, *supra*, § 3524.2 ("In the final analysis, central factors appear to be the degree of autonomy of the defendant and whether recovery against it will come from state funds[] . . . ."). The weight of this authority gives us another reason to decline to read *Hennessey* in the restrictive and narrow manner that MOHELA's argument would require.

For those reasons, we conclude that whether the state is legally responsible for an entity's debts and liabilities—including those stemming from legal judgments—is relevant to the third *Steadfast* factor, and MOHELA's contrary interpretation of *Hennessey* must be rejected. Considering the issue as part of *Steadfast*'s third factor, there is no dispute that the State is not liable for any of MOHELA's liabilities or debts—including any adverse judgment against MOHELA. Accordingly, this subfactor weighs against arm-of-the-state status.

### v.     Conclusion as to the Third Factor

Wrapping up our analysis of the third *Steadfast* factor, we conclude that it weighs strongly against arm-of-the-state status. Supporting this conclusion, MOHELA receives no direct financial assistance from the State, is able to generate revenues through investment and the sale of bonds with minimal State oversight, and

retains substantial control over its own assets.  We respectfully disagree with the district court's determination that such variables weigh "neutral to slightly in favor of immunity."  Aplt.'s App. at 193 (focusing on the fact that "MOHELA does not receive state funding, can issue bonds (although circumscribed by the state), and cannot levy taxes").  And lastly, we draw support for the conclusion from the fact that the State does not bear legal liability for any of MOHELA's debts or liabilities, including adverse judgments.  In sum, the *Steadfast* third factor weighs strongly against arm-of-the-state status.[30]

### d.    Factor Four: The Entity's Concern with State or Local Affairs

The final *Steadfast* factor is "whether the entity in question is concerned primarily with local or state affairs."  *Hennessey*, 53 F.4th at 528 (quoting *Steadfast*, 507 F.3d at 1253).  "In answering this question, we examine the agency's function, composition, and purpose."  *Id.* (quoting *Steadfast*, 507 F.3d at 1253).  Geography plays an important role in this analysis: if the entity's powers extend across the state, that weighs in favor of arm-of-the-state status.  *Compare Steadfast*, 507 F.3d at 1255 (concluding that the fourth factor weighed in favor of arm-of-the-state status when the entity had authority to regulate water distribution in twenty-four Oklahoma counties), *with Couser*, 959 F.3d at 1030 (concluding that the fourth factor weighed

---

[30]    Even if we were to decline to consider the reality that the State would not be liable for a judgment against MOHELA as part of *Steadfast*'s third factor—viewing the other sub-factors in the aggregate—this factor would nevertheless weigh against arm-of-the-state status.

71

against arm-of-the-state status for Kansas sheriffs "[b]ecause a Kansas sheriff's law enforcement responsibilities are limited to the sheriff's county"). Function likewise is important. For example, in *Steadfast*, we concluded that an entity's "conservation function,"—which "mirror[ed] the conservation and regulatory missions of state-run utilities, parks, and recreation areas across the nation"—was inherently statewide in scope, which weighed in favor of Eleventh Amendment immunity. *See* 507 F.3d at 1255–56.

This factor here weighs in favor of arm-of-the-state status.[31] In this regard, we reach the same conclusion as the district court. MOHELA was established to address statewide concerns; in particular, it was established "to perform the 'essential public function' of helping Missourians access student loans needed to pay for college." *Biden*, 143 S. Ct. at 2366 (quoting Mo. Rev. Stat. § 173.360). And MOHELA's

---

[31]    MOHELA correctly points out in its response brief that Mr. Good did not address this factor before the district court. Perhaps this is because Mr. Good framed his analysis as involving the five factors set forth in *Colby*, 849 F.3d at 1275—rather than the four-factor *Steadfast* framework. Ordinarily, Mr. Good's failure to address the fourth factor would raise a question concerning preservation—specifically, a question of forfeiture. *See, e.g.*, *Havens*, 897 F.3d at 1259. However, we need not inquire further into that matter nor definitively opine upon it because even if Mr. Good failed to preserve the issue (i.e., forfeited it), "the district court raised the issue *sua sponte* and decided the question explicitly on the merits," and, consequently, we review the court's decision de novo. *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003) ("We conclude that when the district court *sua sponte* raises and explicitly resolves an issue of law on the merits, the appellant may challenge that ruling on appeal on the ground addressed by the district court even if he failed to raise the issue in district court. In such a case, review on appeal is not for 'plain error,' but is subject to the same standard of appellate review that would be applicable if the appellant had properly raised the issue."); *accord United States v. Guinn*, 89 F.4th 838, 846 (10th Cir. 2023).

profits help to fund education throughout the State of Missouri—not in any specific locality.  *See id.*

Mr. Good's only counterargument is that some aspects of MOHELA's operations are "indisputably national in scope."  Aplt.'s Reply Br. at 17 (citing *Sikkenga*, 472 F.3d at 719).  But the fact that an entity is involved in some projects of national scope is not determinative of this factor.  *See Oberg III*, 804 F.3d at 674 (noting that although "the amount of out-of-state activity" was "relevant," out-of-state activity was not "dispositive" (emphases omitted)).  Looking at the Act, it is evident that MOHELA is concerned primarily with statewide interests and the fact that it does some (unspecified) amount of business in other states does not change that conclusion.  *See* MO. REV. STAT. § 173.360.

The fourth *Steadfast* factor thus weighs in favor of MOHELA being considered an arm of the State of Missouri.

### e.    Conclusion as to the *Steadfast* Factors

For the reasons given above, the *Steadfast* factors do not all point in the same direction.  The first and fourth *Steadfast* factors weigh in favor of considering MOHELA to be an arm of the State of Missouri.  The second and third *Steadfast* factors, on the other hand, weigh against arm-of-the-state status.[32]  Because the

---

[32]    We observe that even if we were to conclude, as the district court did, that the second *Steadfast* factor—autonomy—ultimately weighed in favor of arm-of-the-state status, it would not change the fact that we must proceed to the second step of our arm-of-the-state test because the third *Steadfast* factor—finances—would still point in the other direction—that is, weighing against an arm-of-the-state determination.  *See Hennessey*, 53 F.4th at 528.

*Steadfast* factors point in different directions—in other words, because "indicators of immunity," *Hess*, 513 U.S. at 47, point in different directions—the first step of our arm-of-the-state analysis is not dispositive. *See Hennessey*, 53 F.4th at 528. We must proceed to the second step of the analysis, examining the Eleventh Amendment's twin reasons for being.[33]

### 3.    The Second Step of the Arm-of-the-State Test: The Twin Goals of the Eleventh Amendment

Because the *Steadfast* factors point in different directions, our "prime guide" becomes the Eleventh Amendment's twin reasons for being: protecting a state's dignitary interests and protecting a state treasury. *See Hess*, 513 U.S. at 47; *Hennessey*, 53 F.4th at 528; *Sikkenga*, 472 F.3d at 721; *Duke*, 127 F.3d at 978 & n.10. In other words, we narrow our focus to these two primary considerations. When we do so, it becomes clear that MOHELA is *not* an arm of the state and thus is not entitled to share in Missouri's Eleventh Amendment immunity.

---

[33]    This is the juncture at which the district court erred, likely because it did not have the benefit of *Hennessey*. The district court expressly recognized that the *Steadfast* factors pointed in different directions. But then it simply weighed the factors and decided that, on balance, the factors pointed more towards arm-of-the-state status. After *Hennessey*, that is not the proper analysis: "[i]f the[] factors are in conflict and point in different directions, a court should proceed to the second step and consider the 'twin reasons' underlying the Eleventh Amendment—avoiding an af[f]ront to the dignity of the state and the impact of a judgment on the state treasury." *Hennessey*, 53 F.4th at 528 (quoting *Duke*, 127 F.3d at 978).

### a.   Effect on the Treasury

The "foremost" of the twin reasons is "avoiding state liability for any judgment against the entity." *See Hennessey*, 53 F.4th at 528 (quoting *Sikkenga*, 472 F.3d at 721). "[C]ommon sense and the rationale of the Eleventh Amendment do not require that sovereign immunity attach when an agency is structured to be self-sustaining and has a long history of paying its own way." *Sikkenga*, 472 F.3d at 721.

That is precisely the case here. As explained above, MOHELA's finances are self-sustaining: it receives revenue from a combination of bond sales, investments, and fees. And it retains exclusive control over its own funds. And, most importantly, it is conceded that "the State of Missouri is not directly responsible in the first instance for a judgment against MOHELA." Aplee.'s Resp. Br. at 43. The solid wall of separation erected between MOHELA's finances and the funds in the State treasury means that there is no risk that the State's funds could be depleted to support any judgment against MOHELA.

MOHELA halfheartedly suggests that there may be indirect impacts on the State's treasury if MOHELA is required to pay a judgment against it—including impacts on MOHELA's ability to make payments to the Lewis and Clark Development Fund or to provide scholarship funding. But, as we explained in *Hennessey*, "[t]he focus of th[e] judgment liability issue is on direct legal liability and not on any indirect or practical loss of funds to the state." 53 F.4th at 529. It is pellucid that Missouri does not bear legal liability for a judgment against MOHELA,

75

and MOHELA's argument that requiring it to pay a judgment would indirectly affect the State's coffers is accordingly unavailing.

"Where it is clear that the state treasury is not at risk, then the control exercised by the state over the entity does not entitle the entity to Eleventh Amendment immunity." *Id.* (quoting *Fresenius*, 322 F.3d at 65). Here, there is no risk to the State's treasury, and thus the foremost reason for sovereign immunity points strongly away from considering MOHELA to be an arm of the state.

### b. Dignity of the State

When we focus on protecting the State's dignitary interests, we reach the same conclusion. Safeguarding the dignity of the states is a critically important function of the Eleventh Amendment. *See Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760, 769 (2002); *Kohn*, 87 F.4th at 1027–28. As both parties admit, the relevant inquiry involves the question of whether allowing a suit against an entity to go forward would impact a state's dignitary interests. And that inquiry can be a difficult one in practice. *See Takle*, 402 F.3d at 769 ("[T]he notion of state dignity is difficult to translate into an operational legal standard."); *see also* Jameson B. Bilsborrow, Comment, *Keeping the Arms in Touch: Taking Political Accountability Seriously in the Eleventh Amendment Arm-of-the-State Doctrine*, 64 EMORY L.J. 819, 836 (2015) ("Whereas the effort to assess state treasury implication is at least empirically verifiable—we can measure whether the state will directly or indirectly be forced to pay a judgment—the effort to assess potential affront to a state's dignity is not.").

But we do have some guiding principles. It would offend the dignity of a state to deny arm-of-the-state status (and, by extension, Eleventh Amendment immunity) to an entity that the state designated to share in its sovereignty. But we must keep in mind that not every entity created by a state is entitled to share in its sovereignty, and finding an entity to be an arm of the state when it was not clearly designated as such would be equally offensive to a state's dignitary interests. *See Hennessey*, 53 F.4th at 529.

Ultimately, it is far from clear that the State intended MOHELA to share in its Eleventh Amendment immunity. On one hand, the language of the Act suggests that MOHELA was intended to have the character of a state agency. But, as we explained above, MOHELA is a financially independent entity. *See Sikkenga*, 472 F.3d at 721 ("When a state forms an ordinary corporation, with anticipated and actual financial independence, to enter the private sector and compete as a commercial entity, even though the income may be devoted to support some public function or use, that entity is *not* an arm-of-the-state." (emphasis added)). And it has a fair degree of operational autonomy—particularly in its ability to make contracts, own property, manage its day-to-day affairs, and select its leadership.

In sum, there are "mixed signals" as to whether a suit against MOHELA would truly be a suit that implicates the State's dignity. *Grajales v. Puerto Rico Ports Authority*, 831 F.3d 11, 30 (10th Cir. 2016). When such "mixed signals" are present and it is unclear whether the entity was actually structured to share state sovereignty, it does not offend the state's dignitary interests to permit an action against the entity

77

to proceed.  *See id.* ("By declining to read those mixed signals to express the Commonwealth's intent to make PRPA an 'arm,' we do not give short shrift to the Commonwealth's dignity.  Rather, in exercising such caution, we simply ensure that we do not wrongly confer immunity that ultimately belongs to the Commonwealth on an entity that the Commonwealth did not intend to benefit in that way . . . ." (citations omitted)).

The Fourth Circuit's opinion in *Oberg III* is illuminating on this point.  The *Oberg* litigation involved an entity similar to MOHELA: the Pennsylvania Higher Education Assistance Agency ("PHEAA")—a student loan servicer created by the State of Pennsylvania.  In relevant part, the Fourth Circuit reasoned that permitting a suit against the servicer "does not offend the sovereign dignity of Pennsylvania." 804 F.3d at 677.  The *Oberg III* Court reasoned:

> Although the Commonwealth has imposed some not-insignificant restrictions on PHEAA's operations, the Commonwealth has nonetheless vested PHEAA with broad power over its finances and operations.  PHEAA, not the Governor or the General Assembly, sets policy for the corporation and makes the substantive fiscal and operational decisions. . . .  Thus, the Commonwealth has structured PHEAA to be financially and operationally independent, and PHEAA in fact operates independently, without significant Commonwealth interference or substantive supervision.  In light of PHEAA's intended and actual independence from the Commonwealth, we cannot conclude that it would be an affront to Pennsylvania's sovereign dignity to permit this action to proceed against PHEAA.

*Id.* This reasoning maps well onto a suit against MOHELA: like PHEAA, MOHELA has broad power, and it is financially and operationally independent from the State.[34] As the Fourth Circuit did, "we cannot conclude that it would be an affront" to Missouri's "sovereign dignity to permit this action to proceed." *Id.* Indeed, in light of the conflicting signals as to MOHELA's status, our approach is actually protective of Missouri's dignitary interests.

MOHELA's counterarguments are unpersuasive and cursory. Besides rehashing circumstances that it already discussed—and we have already examined— with respect to the *Steadfast* factors, MOHELA seems to make two primary arguments.

*First*, it seems to argue that it is entitled to immunity under Missouri state law, so it would offend Missouri's dignitary interests to hale MOHELA into federal court. But MOHELA's argument is undeveloped, and, accordingly, we may decline to reach it. *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) ("[A]rguments may be deemed waived when they are advanced in an opening brief only 'in a perfunctory manner.'" (quoting *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004))). And, even if we were to reach this argument, it does not move the

---

[34] To be sure, the Fourth Circuit also relied on circumstances that are not present in this case: for example, that "the Commonwealth admit[ted] in its public financial statements that it cannot impose its will on PHEAA." *Oberg III*, 804 F.3d at 677. But, on the whole, the question of whether a suit against PHEAA would impact Pennsylvania's dignity is strikingly similar to the question before us. And we reach the same conclusion.

needle on the dignitary-interests prong.  Although it may be relevant, the fact that an entity is entitled to immunity under state law "does not determine the extent of Eleventh Amendment immunity."  *Sutton*, 173 F.3d at 1232 (citing *Ambus*, 995 F.2d at 995); *cf. Bakhtiari v. Lutz*, 507 F.3d 1132, 1138 (8th Cir. 2007) (distinguishing between immunity granted under Missouri law and Eleventh Amendment immunity).  And, in fact, immunity under Missouri state law is seemingly "broader than the immunity provided by the Eleventh Amendment.  It extends to municipalities and other public entities that are *not* protected by the 11th Amendment."  *Dykes*, 2021 WL 3206691, at *5 (emphasis added).  In sum, even if we were to reach this argument and assume without deciding that MOHELA would be entitled to sovereign immunity as a matter of state law, that would not change our conclusion as to the State's dignitary interests.

*Second*, at oral argument, MOHELA also argued that it is relevant to the "dignity" aspect of the twin goals that the State of Missouri took the position in its merits briefing before the Supreme Court in *Biden* that "MOHELA is a state-created and state-controlled public entity that performs essential public functions for the State.  As such, MOHELA is part of Missouri."  Oral Arg. Rec. at 22:10–22:36 (quoting Resp'ts' Br., No. 22-506, at *12 (S. Ct., filed Jan. 27, 2023)).

We decline to reach this argument because it does not appear in MOHELA's merits briefing; rather, it was raised for the first time at oral argument.  *See United States v. Eddington*, 65 F.4th 1231, 1240 n.5 (10th Cir. 2023) ("The government introduced this argument for the first time at oral argument.  We will not consider

80

[it]."); *United States v. Anthony*, 22 F.4th 943, 952 (10th Cir. 2022) ("We do not consider arguments raised for the first time at oral argument."). And although the *Biden* decision itself was issued after MOHELA filed its response in this case, the brief from the State of Missouri on which MOHELA relies was filed *before* MOHELA filed its response brief in this case. MOHELA thus had the opportunity to raise this argument in its response brief, but it failed to do so.[35]

### c. Conclusion as to the Twin Goals

When we narrow our focus to the twin goals of the Eleventh Amendment—protecting the state treasury and avoiding an affront to the state's dignity—we conclude that MOHELA is not an arm of the State of Missouri. MOHELA is thus not

---

[35] Even if we were to consider this additional argument, the brief in *Biden* adds little of value to the dignity question. This is not a case in which Missouri has submitted a brief directly notifying us of its position as to MOHELA's status; rather, the brief was submitted in an entirely separate matter. *Cf. Lake Country Ests., Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979) (considering briefs filed in that case by states that disclaimed an intent to confer Eleventh Amendment immunity); *Morris v. Wash. Metro. Area Transit Auth.*, 781 F.2d 218, 224–25 (D.C. Cir. 1986) (considering a joint amicus brief filed in that case by states expressing an intent to confer Eleventh Amendment immunity); *City of Oakland ex rel. Bd. of Port Comm'rs v. Fed. Mar. Comm'n*, 724 F.3d 224, 230 (D.C. Cir. 2013) (considering it relevant that the State of California did not claim a dignity interest when invited to submit an amicus brief). And even in its Supreme Court brief, Missouri did not expressly take the position regarding whether MOHELA is part of the State for purposes of the arm-of-the-state analysis; rather, the State asserted that MOHELA was part of the State for purposes of the distinct issue of standing—the underlying issue in *Biden*. *See* Resp'ts' Br., No. 22-506, at *12. Missouri's representation in its brief in a separate case that involved a separate issue is of minimal probative value here concerning the dignitary-interest phase of the arm-of-the-state analysis.

entitled to share in Missouri's Eleventh Amendment immunity, and the district court erred in granting MOHELA's motion for judgment on the pleadings.

## VI.    CONCLUSION

The district court erred in dismissing Mr. Good's FCRA claims against the Department and MOHELA.  With respect to the Department, we must **reverse** in light of the Supreme Court's conclusion in *Kirtz* that FCRA waives the sovereign immunity of the United States.  And with respect to MOHELA, we must **reverse** because we conclude that it is not an arm of the State of Missouri; accordingly, it is not entitled to raise the defense of Eleventh Amendment immunity.

In sum, for the foregoing reasons, we **REVERSE** the district court's judgment and **REMAND** the case for further proceedings consistent with this opinion.